Nancy WANCHIK, Plaintiff, Appellant,

v.

**GREAT LAKES HEALTH PLAN,
INC., Defendant, Appellee.**

No. 99–2333.

United States Court of Appeals,
Sixth Circuit.

March 2, 2001.

Before MERRITT and COLE, Circuit

Judges and HOOD, District Judge.*

PER CURIAM.

Plaintiff Nancy Wanchik appeals a district court's decision granting the defendant's summary judgment motion. For the reasons which follow, we affirm in part and reverse in part the decision of the district court and remand for further proceedings consistent with this opinion.

## I. FACTS

Plaintiff began working with First Care Health Plan in 1977 as a medical assistant. Over the next twenty years, she gained experience as a health care administrator overseeing the member services, marketing, network development, and accounting departments. By the early 1990s, she was Chief Executive Officer of the HMO. On March 6, 1996, Great Lakes Health Plan purchased First Care. After the sale, Wanchik continued as CEO and reported to Donald Zinner, President and CEO of Great Lakes. Other principal members of the executive team were: Bryan Schefman, Senior Vice President of Legal and Government Affairs; Barry Beck, Chief Medical Officer; Bruce Nager, President of Qualnet (a management service organization) and Senior Vice President of Clinic Services; and Alan Tobes, Vice President of Finance and Chief Financial Officer. Kipton Kaplan, who first joined Great Lakes as a consultant, later became Chief Operating Officer after plaintiff's departure.

Plaintiff recalls that Zinner asserted his authority very quickly after the acquisition of First Care. Wanchik claims that she was summoned to his office within the first week. There, he told plaintiff that her position as CEO of First Care would be titular only and that he would oversee day-to-day responsibility for the plan. J.A. 266. Zinner said that he was "humbling" her. J.A. 272. In deposition, Zinner explained that plaintiff "was more focused on wanting my job than on doing her own" and that "her ego was getting in the way of her decision-making." J.A. 91.

Wanchik complained of this treatment to Alan Tobes, Vice President of Finance. According to plaintiff, "He said he thought that it was because I was not male and Jewish." J.A. 268. In her EEOC charge, plaintiff recalled that Tobes made the statement "in a joking manner but I believe he spoke the truth." J.A. 214. Tobes denies making the statement. J.A. 404.

The next several months were unhappy for Wanchik. She claims that she was excluded from executive meetings and that her contributions to management were ignored. She also alleges that she was not permitted to implement decisions for her department and that her work was meaningless. Two colleagues have signed statements describing how plaintiff's authority was undercut and that the management anticipated and possibly contrived her departure from the company within a year. J.A. 202, 204.

Plaintiff's assistant, Michele Lundberg, was also unhappy and contemplated leaving. When Zinner learned of this, he reassigned staff positions in an effort to entice Lundberg to stay. Lundberg was given plaintiff's position as CEO of First Care, while Wanchik was made Vice President of Marketing and Strategic Planning for Great Lakes. Because she had no interest or expertise in marketing, plaintiff now claims that this transfer was a "demotion."

---

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Nevertheless, she decided to "give it [her] best shot." J.A. 69. Her benefits and $150,000 compensation stayed the same. In this newly created position, plaintiff alleges that she never received the support of management and that her staff bypassed her in favor of Kipton Kaplan, a consultant who would later assume her job responsibilities after she left.

During this time, plaintiff claims that Great Lakes fostered a sexist and vulgar environment through inappropriate humor and conduct. As part of her complaint, plaintiff has offered several affidavits and statements by female colleagues who corroborate her impression of a sexist office culture. Some of the statements are unsigned because, according to Wanchik, their authors fear reprisal in the health care industry. The signed statements describe offensive comments by Nager, either pressuring co-workers for sex or making crude sexual assessments ("Nager called another employee, Nancy Rich, a 'dumb blonde bitch' and said she needed to be 'fucked up the ass.' He said, 'I know she will like it because she likes it hard. Maybe we should both fuck her, she's got that man look about her.'") J.A. 203–05, 211–212. Other statements detail sexual advances, intimidating, and fondling by Howard Rosenberg, Senior Vice Present of Network and Marketing. J.A. 206–210.

On January 24, 1997, Wanchik resigned to accept a position as Administrator of the Medical Management Company of America. She claims that the transfer was involuntary and resulted in a pay cut of $25,000 and a forfeiture of annual bonuses. Plaintiff has since changed jobs again. Currently, she is Chief Operating Officer of Cape Health Plan, where her annual salary is $175,000.

On April 25, 1997, Plaintiff filed an Equal Employment Opportunity Commission complaint charging discrimination. On December 9, 1997, Plaintiff filed this action, alleging gender and race discrimination as well as sexual harassment under federal and Michigan law. The District Court granted summary judgment for the defendant on all claims. Plaintiff now appeals.

## III. ISSUES

Plaintiff briefs a number of issues. Wanchik first appeals the District Court's application of summary judgment. Because this challenge to fact-finding is implicit in each of the other substantive arguments, it will not be discussed separately. Plaintiff also appeals the District Court's determination of constructive discharge. This challenge is properly considered in the context of her gender discrimination claim. The issues, then, are:

A. *Whether plaintiff presented a prima facie case of gender discrimination.*

1. Disparate Treatment

2. Sexual Harassment

B. *Whether plaintiff can maintain a claim for race discrimination.*

## IV. ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The standard of review for a district court's grant of summary judgment is *de novo*. *Neshewat v. Salem*, 173 F.3d 357, 361 (6th Cir.1999). The court must infer all facts in a light most favorable to the non-moving party. *Id.* Because this case is so fact-intensive, Great Lakes has a formidable challenge in demonstrating that the evidence "is so one-sided that one party must prevail as a matter of law."

Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1310 (6th Cir.1989) (quoting Anderson v. Liberty Lobby, Inc. ., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The District Court ruled that the defendant met this burden. With respect to plaintiff's claim for sexual harassment, the District Court erred. The evidence reveals a genuine factual dispute about whether Nancy Wanchik experienced a hostile work environment during her employment at Great Lakes. Accordingly, summary judgment in favor of Defendant should be REVERSED on this issue and the case REMANDED for further consideration of plaintiff's claim for sexual harassment due to a hostile work environment.

A. *Whether plaintiff presented a prima facie case of gender discrimination.*

Plaintiff charges gender discrimination under Title VII of the Civil Rights Act of 1964 and under Michigan's Elliott–Larsen Civil Rights Act, MICH. COMP. LAWS § 37.2101 et seq. Because the state civil rights act so strongly parallels its federal counterpart, Michigan courts generally look to Title VII jurisprudence in deciding discrimination claims. *See, e.g., Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 775 (6th Cir.1996); *Radtke v. Everett,* 442 Mich. 368, 501 N.W.2d 155, 162 (Mich. 1993). Title VII of the federal civil rights statute states: "It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). Plaintiff here alleges two varieties of gender discrimination: disparate treatment on the basis of gender and sexual harassment.

1. Disparate Treatment

Plaintiff claims that Great Lakes treated her differently because she was a woman. To illustrate her claim of intentional discrimination, she claims she was "never allowed to function as CEO of First Care" and that she was "physically isolated and excluded from the day-to-day operations of her company." According to Wanchik, the male executives were given greater authority and autonomy than she, both in her "phony CEO position" and after she was "demoted" to Vice President of Marketing. Wanchik claims that, because of her gender, she was given meaningless work in an effort to expedite her departure from the company. In this accusation, she echoes the complaint of the plaintiff in *Jacklyn v. Schering–Plough Healthcare Products Sales Corp.,* 176 F.3d 921 (6th Cir.1999). There, this Court affirmed summary judgment for the defendant on federal and Michigan gender discrimination claims. In describing plaintiff's burden of proof, *Jacklyn* states: "Plaintiff alleges she was subjected to disparate treatment because of her sex in an effort orchestrated by [her manager] to force her to resign or be terminated. Such a claim of intentional discrimination may be established by either proffering direct evidence of discrimination, or relying on circumstantial evidence to create an inference of discrimination." *Id.* at 926 (citations omitted). Wanchik must make the same showing here.

a. Direct Evidence

"In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* Accepting, for purposes of summary judgment, that plaintiff was excluded and undermined as she alleges, she still cannot show

that her treatment was a result of her gender. In her brief, plaintiff describes the "general atmosphere of sexism" as evidence of "the employer's propensity to discriminate against a protected group." Such generalities do not furnish direct evidence of discrimination, however.

■ Title VII prohibits only conduct by an "employer." 42 U.S.C. § 2000e–2(a)(1). Though co-worker hostility may be actionable as sexual harassment, as will be discussed, it does not support a claim for direct gender discrimination. Wanchik reported to Zinner, who, as CEO and President of Great Lakes, acted as her "employer." It is true that Zinner told plaintiff she needed "humbling." J.A. 91. It is also true that Alan Tobes, Vice President of Finance, attributed Zinner's comment to the fact that plaintiff "was not male and Jewish." J.A. 268. But this Court should not rely upon a co-worker's characterization of an employer's statement, especially when plaintiff has conceded that Tobes spoke "in a joking manner." J.A. 214. Zinner explained that plaintiff needed "humbling" because "her ego was getting in the way of her decision-making." J .A. 91. According to Zinner, "humbling" was a management technique that he used on other executives as well, including male subordinates. J.A. 92.

■ Though plaintiff describes territorial office behavior, the record does not reveal that "unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn,* 176 F.3d at 926. Zinner may have been heavy-handed, but "personal conflict does not equate with discriminatory animus." *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 791 (6th Cir.2000) (quoting *Barnett v. Dep't of Veterans Affairs,* 153 F.3d 338, 342–343 (6th Cir.1998)).

### b. Indirect Evidence

Wanchik also claims that she established a *prima facie* case by presenting sufficient circumstantial evidence. Under the familiar *McDonnell Douglas* framework, a plaintiff creates an inference of gender discrimination when she shows that: "(1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) she was qualified, and (4) she was treated differently than similarly-situated male employees for the same or similar conduct." *Jacklyn,* 176 F.3d at 928 (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582–83 (6th Cir.1992)).

### i. Adverse Employment Action

■ Plaintiff cannot meet the second factor. She specifies two "adverse employment actions" on the basis of her gender: her "demotion" from CEO of First Care to Vice President of Marketing for Great Lakes and constructive discharge. In ruling on a discrimination case under the Americans with Disabilities Act, this Court noted that the plaintiff was "required to show, as part of her prima facie case, that the employer's actions about which she complains were 'materially adverse.'" *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (citations omitted). In *Bowman v. Shawnee State University,* this Court applied a "materially adverse" standard in the context of sexual harassment and discrimination claims. *Bowman v. Shawnee State University,* 220 F.3d 456 (6th Cir.2000). Finding that plaintiff had not suffered an adverse employment action, *Bowman* noted:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termi-

nation of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Id.* at 461–62 (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir.1999)). Even assuming, for purposes of summary judgment, that plaintiff did not seek out or consent to her re-assignment, the transfer alone does not constitute a "materially adverse" employment action. Wanchik did not suffer a loss of wages or benefits. At most, in her own words, she traded one "phony" position for another. As defendant correctly points out, plaintiff inconsistently argues that her role as CEO of First Care was "pretend" and "meaningless." When she claims to have been involuntarily transferred, however, she protests the loss of prestige and material duties of her former CEO position. Her argument that the transfer was a materially adverse employment decision is unpersuasive.

■■■ Equally unpersuasive is plaintiff's claim of constructive discharge. "A finding of constructive discharge in this circuit requires an inquiry into both the objective feelings of an employee and the intent of the employer. A constructive discharge exists if 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Yates v. Avco Corp.*, 819 F.2d 630, 636–37 (6th Cir.1987) (quoting *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir.1982)). According to plaintiff, Zinner announced to the office that Wanchik had requested to be transferred to Vice President of Marketing. A press release had already been distributed in early November detailing the transfer. Yet Zinner, according to

plaintiff, lied about who requested it and why during an office Christmas party in 1996. At that moment, recalls Wanchik, "I think that's when I felt I was constructively discharged." J.A. 83.

But Wanchik never complained of discrimination while at Great Lakes–not to Donald Zinner, not to human resources, not to colleagues, not even to her long-time assistant Michele Lundberg. On January 24, 1997, Wanchik resigned to accept a position as Administrator of Medical Management Company of America. She admits she was not searching for a new job at the time the opportunity arose. J.A. 72. When she resigned, she offered one-month's notice. Her letter read, in its entirety:

> I regret to inform you that I have decided to resign from the position of Vice–President of Marketing for Great Lakes Health Plan. Thank you for the opportunity to work with you and this company. I would like to discuss the logistics of my departure with you at your earliest convenience. I wish you all a prosperous and happy future.

J.A. 107. Before departing, Wanchik attended a going-away dinner. She also delivered and endorsed a subcontracting proposal from Great Lakes to her new employer.

After plaintiff's departure from Great Lakes, a contractual dispute arose over deferred compensation owed to Wanchik as a result of the acquisition of First Care. Two months later, Wanchik filed the EEOC charge that led to this action. Great Lakes argues that the timing is significant, maintaining that her accusations arose only as the post-employment relationship soured. According to Great Lakes, plaintiff resented Zinner as president as CEO and voluntarily left the company to pursue a position with greater authority. Wanchik responds that she was

simply too professional to disparage the company and had hoped the atmosphere would improve. Claiming that her departure was involuntary, she recalls that she was too depressed to think of quitting or looking for other work until she learned of the opportunity with the Medical Management Company of America.

As will be discussed, there is a genuine issue of fact concerning the hostile and harassing environment of Great Lakes towards female employees. However, the record does not support that plaintiff departed involuntarily as a result of this office climate. Wanchik's willingness to part on amicable terms, coupled with an absence of any complaints of discrimination during her tenure, sever the all-important causal connection that plaintiff "felt compelled to resign."

Accordingly, she cannot claim an adverse employment action as a result of discrimination.

ii. Different treatment compared to similarly-situated male employees

■ Wanchik also fails to satisfy the fourth factor of the *McDonnell Douglas* framework. Plaintiff makes only conclusory allegations that male executives enjoyed greater authority and autonomy than she or other women in the company. Defendant points out that Wanchik was replaced by a woman–Michele Lundberg–as CEO of First Care when plaintiff became Vice President of Marketing. Moreover, the organizational chart for Great Lakes shows a woman in the position of Vice President of Information Systems, which belies Wanchik's depiction of male-only management. J.A. 196.

In conclusion, Wanchik has failed to establish a case of disparate treatment, either by direct proof of intentional discrimination or by prima facie evidence according to the *McDonnell Douglas*

framework. This conclusion, of course, does not defeat plaintiff's claim of sexual harassment nor absolve Great Lakes of potential liability for maintaining a hostile work environment, an issue to be decided on remand. *See, e.g., Pollard v. E.I. DuPont de Nemours, Co.*, 213 F.3d 933, 943 (6th Cir.2000), *cert. granted*, —— U.S. ——, 121 S.Ct. 756, 148 L.Ed.2d 659, 69 U.S.L.W. 3365 (U.S. Jan. 8, 2001) (No. 00–763) ("[I]t is not necessary to prove economic disparate treatment in order to make out a prima facie case of coworker hostile environmental sexual harassment.").

2. Sexual Harassment

In a landmark interpretation of sexual harassment under Title VII, the United States Supreme Court distinguished between quid pro quo claims and hostile environment claims. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 62, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Though the Court has since recognized the limited utility of these short-hand references, it noted that they are still helpful "in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether." *Burlington Industries v. Ellerth*, 524 U.S. 742, 751, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

a. "Quid Pro Quo"

Plaintiff makes no claim that anyone at Great Lakes made coercive sexual advances or conditioned job benefits on submission to sexual favors.

b. "Hostile Work Environment"

■ Instead, Wanchik alleges that her colleagues–specifically, Bruce Nager, Howard Rosenberg, Bryan Schefman, and Alan Tobes–created an environment abusive to women by "telling lewd jokes, describing

sexual fantasies, and denigrating women's bodies." J.A. 3. Though plaintiff describes these men as her "supervisors" because they sat on the Board of Directors of First Care, the record reflects that the Board seldom met, if ever. J.A. 183. Only Donald Zinner, CEO and President, directed plaintiff's work and can properly be considered her supervisor. J.A. 94. According to plaintiff, "Don Zinner did not sexually harass me." J.A. 80. Her claim, therefore, is for sexual harassment by co-workers. As this Court has noted:

> [I]n order for a plaintiff to establish a *prima facie* Title VII claim of hostile environment sexual harassment by a co-worker, she must demonstrate that the following elements of the statutory tort are present: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment unreasonably interfered with the plaintiff's work performance or created a hostile or offensive work environment that was severe and pervasive; and (5) the employer knew or should have known of the charged sexual harassment and failed unreasonably to take prompt and appropriate corrective action.

*Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829–30 (6th Cir.1999). *See also* 29 C.F.R. § 1604.11(a), (d).

i. The experience of the entire protected class

 To support her claim of an environment hostile to the protected class of women, Wanchik provides a number of signed and unsigned affidavits from female employees. J.A. 203–205 (Rebecca Leinenger); 206 (Bonnie Burk); 208 (Staci Houston); 211 (Elizabeth Stevenson). The District Court properly rejected the unsigned statements in accordance with FED. R. CIV. P. 56(e). Yet the District Court also ignored the properly executed statements that corroborated plaintiff's description of Great Lakes as a vulgar and sexist workplace. Some of the statements, in fact, related incidents even more appalling and abusive than those personally experienced by plaintiff, describing how Great Lakes executives fondled and caressed women. The District Court ignored these because "plaintiff admits she was unaware of these incidents of sexual harassment during her employment." J.A. 491. In this, the court erred as a matter of the record.

 In *Jackson v. Quanex Corp.*, this Court explained, "The notion that courts should deem probative the conduct of an employer towards an entire minority group–even when an individual, and not a group, brings the complaint–is not new to this realm." *Jackson v. Quanex Corp.*, 191 F.3d 647, 660 (6th Cir.1999). In reversing judgment for the employer on a racial discrimination claim, *Jackson* found that the trial court erred in dismissing incidents of racial harassment that were not directed at plaintiff or did not occur in her presence. As the court observed:

> [A]n employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff herself.... [I]n the sexual harassment context, this Court has deemed probative remarks that demeaned women generally while not demeaning any one woman in particular. *See Abeita v. TransaAmerica Mailings, Inc.*, 159 F.3d 246, 251–52 (6th Cir.1998) (considering evidence that employees commented that land adjacent to a Hooters restaurant should be called "Hootersville," "Titsville," or "Twin Peaks," and used the term "broad" to refer to a female). We have also credit-

ed evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used. Indeed, "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment."

Id. at 661 (citations omitted).

Clearly, then, episodes of harassment concerning other women are probative to plaintiff's experience in a hostile work environment, even if not directed at plaintiff herself. *But see Burnett v. Tyco Corp.* 203 F.3d 980, 981 (6th Cir.2000) (only considering allegations of harassment that were directed to and with knowledge of plaintiff). Of course, plaintiff must have been aware of these incidents during her employment, even if indirectly, for the accounts of others to be relevant. *Cf. Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 249 n.4 (6th Cir.1993) (dismissing as irrelevant testimony concerning harassment about which plaintiff knew nothing during her employment).

■ Contrary to the finding by the District Court, Wanchik was aware of inappropriate sexual behavior among her male co-workers and other female employees during her employment. She heard "indirectly" that Lisa Hendrickson "had been sexually harassed" by Howard Rosenberg. J.A. 47. She heard a rumor concerning Bruce Nager and Rebecca Leinenger. J.A. 47, 87. She may or may not have known at the time that Elizabeth Stevenson also complained about Nager. J.A. 48. She "knew there was something with Nancy Rich and Howard [Rosenberg]." J.A. 49. She heard a rumor that Nager "was after" Kristin Jazicks. J.A. 50. She also heard rumors about Dawn Kohler, Howard Rosenberg, and Bryan Schefman. J.A. 87. Though plaintiff did not know the details of these incidents and

lacked the proof of confirmation (which would come later), it cannot be said that she was "unaware" of what was happening to female workers at Great Lakes. Her awareness, however peripheral, of how her male co-workers treated the entire protected class contributed to her perception of a hostile work environment. This treatment at least raises an issue of material fact as to the pervasiveness of the abuse. *Cf. Abeita,* 159 F.3d at 252 ("Plaintiff's inability to recount any more specific instances [of inappropriate banter] goes to the weight of her testimony, a matter for the finder of facts.") On remand, the District Court should consider not only the incidents of harassment that plaintiff personally experienced but also those of which she was aware, even learned second-hand.

ii. Subjected to unwelcome harassment

In addition to her vicarious exposure to sexual harassment, plaintiff alleges several personal examples. The most egregious occurred during a strategic meeting in November 1996. During that planning session, plaintiff apparently was chewing on her necklace. According to plaintiff, Bruce Nager later told her that this idle gesture made him think about having "his balls in my mouth." J.A. 242. Wanchik also alleges that she heard Nager, Tobes, and Schefman tell numerous dirty jokes degrading towards women and minorities. While plaintiff cannot recall the specifics, she recalls a few illustrations of their offensive content:

- Schefman told ethnic jokes that mocked and impersonated minorities and African Americans.

- Tobes and others joked about what Dr. Beck "liked to do with Asian women."

- Nager described his group sexual fantasies.

In deposition, Tobes and Schefman admitted that "it was possible" they told dirty jokes at the office in the presence of women. J.A. 390, 399. When asked if he had told "dirty jokes" in the presence of Nancy Wanchik, Tobes responded: "I'm sure I have." J.A. 399. Clearly, plaintiff was subject to unwelcome and inappropriate sexual commentary.

### iii. Based on sex

 This element is satisfied by showing harassing behavior that is either lascivious in nature or that reflects an "anti-female animus ." *Williams v. General Motors Corporation,* 187 F.3d 553, 565 (6th Cir.1999). All of the conduct plaintiff describes–whether personally experienced or learned from others–was "based on sex" by this definition.

### iv. Harassment created a severe and pervasive hostile work environment

 Discrimination creates a hostile work environment "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations and internal quotations omitted). This a simultaneously objective / subjective inquiry that determines: "(1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.'" *Williams,* 187 F.3d at 568.

● Objective Component

"The court must consider the totality of the circumstances when determining whether, objectively, the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment." *Bowman,* 220 F.3d at 463. The Supreme

Court has outlined a number of factors to consider in making this determination. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23, 114 S.Ct. 367.

Here, the District Court concluded that the incidents cited by plaintiff were "merely offensive." J.A. 491. As previously discussed, however, the District Court failed to consider the instances of sexual harassment involving other women of which plaintiff was aware during her employment. While Wanchik admittedly did not know the details of these episodes, she was aware of many rumors. In fact, as plaintiff describes it, the rumors showed the offensive conduct to be on-going and commonplace. As she explains, "I heard a lot of rumors when I was at Great Lakes" and "I don't recall when I first started hearing the rumors. They were around. The rumors were around." J.A. 50, 87. Though rumors alone lack the psychological punch of personal harassment, they can by their pervasiveness contribute to a hostile work environment. As the Ninth Circuit has noted, "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir.1991).

Plaintiff knew of rumors that revealed the sexual predation of male management. The District Court erred in not considering how these could have poisoned the office environment.

● Subjective Component

After reviewing these incidents, the District Court noted that plaintiff "has not demonstrated she subjectively perceived

her workplace to be abusive." J.A. 492. The court further noted that plaintiff "voluntarily and enthusiastically participated in the boorish behavior." J.A. 492. This conclusion is nowhere supported in the record. The District Court correctly observed that plaintiff sang "Happy Birthday, Mr. President" at a dinner party for Zinner, as a parody of Marilyn Monroe performing for President Kennedy. Without attribution, the court describes Wanchik's performance as "suggestive." J.A. 492. Wanchik however, only recalls it as "silly." J.A. 73. Her assistant, Michele Lundberg, described it as "funny" but denied that there was any sexual connotation or content to the performance. J.A. 370. As further proof of plaintiff's receptivity to boorish behavior, the District Court noted that Wanchik brought back souvenir drawings for co-workers from a 1996 trip to India. These cards, or "Persian miniatures," depict life in India, portraying parades, battles, or domestic scenes inside the castle. One scene shows a man and a woman, fully clothed, in a stylized embrace. J.A. 121. The court described this card as a "love scene," echoing the term used by defendant's counsel during deposition. J.A. 71.

That the song and drawing cast plaintiff as a willing participant in the lewd office culture is doubtful at best. Moreover, these examples certainly do not render the vulgar jokes and statements any less unwelcome. The District Court erred in concluding that the song and drawing somehow negated the offensive comments plaintiff encountered. This evidence is grist for the finder of fact, not grounds for summary judgment.

> v. The employer knew or should have known of the abuse and failed to take corrective action

█ Finally, plaintiff must demonstrate that defendant "tolerated or condoned the situation" or "that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action." *Jackson,* 191 F.3d at 659 (quoting *Davis v. Monsanto Chem. Corp.,* 858 F.2d 345, 349 (6th Cir.1988)). Great Lakes points out, correctly, that Wanchik never reported or complained of the alleged harassment to anyone. Yet, as this Court has noted in the analogous context of a racially hostile work environment, the plaintiff need not report the offensive conduct of co-workers to prevail.

> Rather, to succeed, the plaintiff must establish that the employer "knew or should have known" of the offenses. The case at hand illustrates the relevance of this distinction, since, particularly as to the slurs and racial graffiti presumably perpetrated by co-workers and hostile to Jackson [the plaintiff], it is important to observe that although Jackson herself did not report every instance of what she saw to management, other African–American employees testified that they did report them to management.... Moreover, in cases such as this, where harassment is pervasive, courts may impute constructive notice to an employer.

*Id.* at 663.

Defendant points out that the employee handbook–which plaintiff claims never to have received–lists Wanchik as one of four people to whom Great Lakes employees should report violations of the company harassment policy. J.A. 118. Yet that same handbook page lists Bryan Schefman as well, who admitted that it was "possible" that he told off-color jokes to female employees at work. J.A. 390. Zinner, CEO and President of the company, admitted that he had heard Alan Tobes telling dirty jokes, which "could have" been at work and were "possibly" in the presence

of women. J.A. 93. The employee handbook describes as prohibited conduct, inter alia, "off color language or jokes of a sexual nature." J.A. 118. Yet Zinner did not admonish Tobes about the jokes. J.A. 93.

Another female employee, Rebecca Leinenger, alleges that she and two other women approached Geoff Gale, Director of Human Resources, to complain of Howard Rosenberg's sexually inappropriate behavior. J .A. 204. Gale is listed in the employee handbook as someone with whom to lodge such complaints. J.A. 118. According to Leinenger, Rosenberg learned of this meeting and told her "if we ever went to Gale again about anything other than pay or benefits we would be fired immediately." J.A. 204. Nancy Rich also complained of Rosenberg's offensive conduct in a memo addressed to Gale on August 5, 1996. J.A. 217–219. Gale dismissed the complaint less than a month later for lack of evidence. J.A. 220. Part of his justification for closing the investigation was that Rich, who had apparently quit in the interim, had "not requested that we pursue this matter beyond her tenure here." J.A. 220. Informally, however, Zinner and Kipton Kaplan talked with Rosenberg "over dinner" reminding him "what appropriate behavior is." J.A. 375, 382–83.

The timing of Rebecca Leinenger's complaint is not in the record. It is clear, however, that Zinner and others were aware of Nancy Rich's allegations well before plaintiff's resignation on January 24, 1997. Moreover, Zinner and other male executives admitted to hearing, if not participating in, sexually explicit jokes and off-color commentary that violated defendant's own harassment policy. There is at least a genuine issue of fact as to whether Great Lakes had constructive notice of the workplace hostility and abuse towards women. On remand, the District Court will ascertain the appropriateness and efficacy of defendant's corrective actions.

In conclusion, the District Court erred in granting summary judgment in favor of defendant on plaintiff's claim of sexual harassment due to a hostile work environment. This appeal turns on characterization of fact more than questions of fact. How the workplace at Great Lakes was and was perceived –whether a joke is simply risqué or crudely salacious, whether a remark is posturing or predatory, whether an employee feels a frisson of delight or terror at a co-worker's explicit asides–is a matter for the finder of fact. The District Court's reconstruction of office culture erred in not considering the experiences of other women of which plaintiff was aware during her employment. Because Wanchik has at least shown an issue of material fact as to co-worker harassment, summary judgment for Great Lakes should be REVERSED and plaintiff's claim REMANDED.

B. *Whether plaintiff can maintain a claim for race discrimination.*

 Wanchik alleges that the workplace at Great Lakes was "infected not only by sexism but by routine racial and ethnic aspersions." Pl.'s Br. at 50. A plaintiff establishes a prima facie case of hostile work environment due to race when she shows that:

1. She was a member of a protected class;

2. She was subjected to unwelcome racial harassment;

3. The harassment was based on race;

4. The harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and

5. The existence of employer liability.

*See Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir.1999).

■ Plaintiff, who is white, has not claimed membership in a protected racial or ethnic class. Rather, she claims that "any person aggrieved by a work environment infected with hostility toward any protected group has standing to sue for redress." Pl.'s Br. at 51. It is true that this Court has not required strict membership in the protected class to sustain a claim for racial discrimination. *See, e.g., Johnson v. University of Cincinnati,* 215 F.3d 561, 574 (6th Cir.2000), *cert. denied,* 531 U.S. 1052, 121 S.Ct. 657, 148 L.Ed.2d 560 (2000) ("Simply put, this Court has now spoken that in order to state a cognizable claim under Title VII, the plaintiff himself need not be a member of a recognized protected class; he need only allege that he was discriminated on the basis of his association with a member of a recognized protected class.") (involving plaintiff's advocacy on behalf of women and minorities in challenging the employer's discriminatory hiring practices); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, and GMC Trucks, Inc.,* 173 F.3d 988, 994 (6th Cir.1999) (reading Title VII to prohibit discrimination "directly or indirectly" due to an individual's race, finding that plaintiff stated a claim by alleging discrimination because his child was biracial).

Here, plaintiff has not alleged advocacy on behalf of, or any association with, members of a protected class. Thus, she cannot state a claim for racial discrimination under Title VII. The District Court properly dismissed this claim.

## V. CONCLUSION

The judgment of the District Court is affirmed in part and reversed in part. Summary judgment for Defendant on the claim of gender discrimination due to disparate treatment is AFFIRMED. Summary judgment for Defendant on the claim of race and ethnic discrimination is AFFIRMED. Summary judgment for Defendant on the issue of sexual harassment due to a hostile work environment is REVERSED and the claim is REMANDED for further proceedings.