DAMON J. KEITH, Circuit Judge,
dissenting.
I strongly disagree with the majority’s decision to affirm the district court’s dismissal of this sexual harassment claim on summary judgment. It is unclear whether the majority, determined to allow Defendant Goodyear Tire & Rubber Co. to escape liability for the egregious and frankly disgusting sexual harassment suffered by Plaintiff Donna Mullins, ever read the record in this case. While the majority correctly states the standard of review for summary judgment, in its reasoning, the majority ignores key facts and incorrectly views the evidence in the light most favorable to the moving party. Because I believe that there are material facts sufficient to raise a question for the jury, I dissent.
I.
The district judge in this case made a specific finding that “Plaintiff [Donna Mullins] has pointed to evidence in the record which would allow the trier of fact to find that ‘the charged sexual harassment had the effect of unreasonably interfering with [the plaintiffs] work performance and creating an intimidating, hostile, or offensive working environment.’ ” (J.A. 392) (quoting Rabidue v. Osceola Refining Co., 805 F.2d 611, 619-20 (6th Cir.1986)). Because the majority omits and glosses over the harassment that Mullins endured, it is necessary to recount the facts separately.
*751 Mullins was the only woman working on her shift at Goodyear’s tire manufacturing plant in Union City, Tennessee, which employs over 2,200 individuals. (J.A. 62, 211.) From about 1999 to October 27, 2005, Mullins worked primarily as a bead operator.[5] (J.A. 54-58.)
The Goodyear employees who allegedly harassed Mullins are Autry Lee Dale “Red” Parker and William “Bill” Jones. Parker and Jones were nonsupervisory employees who worked with Mullins. Jones was elected as a “lead hand,” (J.A. 70) whose special duties included administrative tasks, such as administering vacation and overtime and ordering supplies. (J.A. 68-69, 212.)
Over the years, Jones engaged in sexually inappropriate behavior towards Mullins. (J.A. 392-93.) Jones’s treatment of Mullins, however, worsened after Jones was elected lead hand. (J.A. 78-88.) In addition, Parker allegedly engaged in hostile behavior towards Mullins,[6] including sabotaging her machine on several occasions. (J.A. 89-90, 93-99.) The district court, finding that Mullins presented sufficient evidence to convince a jury that the sexual harassment was sufficiently “severe and pervasive,” summarized the alleged facts as follows:
Bill Jones refused [Mullins] vacation days, scheduled male workers ahead of her, and would write himself ahead of her even though he was not on the books; although Jones was a relief man who was supposed to relieve the bead unit operators, such as [Mullins], when they needed a break, he purposefully relieved [Mullins] late for breaks and, when [Mullins] was on a break, he would leave early; Jones timed [Mullins’] bathroom breaks, but not the bathroom breaks of male workers; Jones made sexual references about [Mullins’] breasts “hundreds of times” on a daily basis and, on one occasion, pulled her shirt out; he also hugged her on a weekly basis until she struggled out of it; Jones “lurched” at [Mullins] in an “attack fashion” and had to be restrained by another man; Jones laughed, stared, and pointed at [Mullins] while she was working; Jones cursed at [Mullins] and called her names such as “lazy bitch”; Jones complained to the male workers about [Mullins’] job performance; Jones purposefully shut down [Mullins’] machine and submitted a false work order so that he would not have to change a wire on [Mullins’] machine; Jones grabbed [Mullins] on one occasion and kissed her on the cheek as she tried to get away; when [Mullins] needed tools for a job and had to ask Jones, who was the lead hand, Jones would give her the “third degree” — asking her questions about why she needed it, in contrast to how he treated the men; when Jones left [Mullins’] machine early when he *752 relieved her, he did not advise her of the status of her machine, if anything was wrong, and would not assist her in fixing things that went wrong; instead of handing [Mullins] her paycheck, Jones put it on the edge of a book near four fans while handing the men their checks by normal distribution; when [Mullins’] schedule was changed by Bone, Jones did not inform her of the change; Parker changed out [Mullins’] spools to cause her more work and tampered with [Mullins’] gauges which he did not do to the male workers; Parker tightened a bolt on [Mullins’] machine so tight that neither she, Ricky Davis, or Jackie Bone could loosen it; Parker told [Mullins] on numerous occasions that he served in Vietnam and that it would be “nothing for me to kill someone”; during the investigation, Parker came to [Mullins’] department every day even though he was supposed to be staying away; after the investigation, Parker drove a fork truck within an inch of [Mullins] while she worked her bead unit, thus scaring her; Parker and Jones, together, came into the break room while [Mullins] was there and partially blocked the door, forcing [Mullins] to squeeze by them.
(J.A. 392-94.) In addition, Parker made statements to Mullins, such as “if you weren’t married, you’re a good looking woman, I’d give it a try,” (J.A. 91), and Jones told her, “[W]hy don’t you show me your boobs.” (J.A.75.)
On September 19, 2005, Mullins told Bone that she wanted a meeting with Human Resources to discuss the alleged harassment by Parker and Jones. Mullins reported the most recent sabotage of her machine and other workplace incidents to James Harris, a Goodyear manager. (J.A. 78-79, 104, 190-93.) Although she tried to report Jones’s sexual behavior, beginning by saying that she and Jones “had issues for years,” (J.A. 78, 116), Harris abruptly cut her off, saying, “Let’s just take care of the issue at hand.” Id. Mullins identified two potential witnesses to Parker’s sabotage of her machine. (J.A. 193.) Goodyear initiated an investigation and temporarily separated Parker from Mullins. (J.A. 182.) As part of Goodyear’s investigation, Parker, Jones, and the two witnesses were interviewed. (J.A. 166-67, 193-203.) Although Parker and Jones denied most of the allegations, Parker admitted to putting partial rolls of wire on her bead unit, thereby forcing Mullins to change rolls more frequently. (J.A. 194.) Parker’s alleged reason for doing this was “because [the rolls] were dirty, had rust, and they needed to be used up.” (J.A. 195.) Eddie Holland, a worker in the bead unit, confirmed that Parker had replaced the rolls on Mullins’ machine. (J.A. 199.) In addition, Ricky Davis, another co-worker, contradicted Parker’s alleged business purpose for changing the rolls, telling Goodyear that “Parker told [Davis] that he was taking the partial rolls and putting them on [Mullins’] machine on purpose, so that she would have to do more changeovers.”[7] (J.A. 200-01.) When Goodyear interviewed Jones, he admitted to leaving Mullins’ machine early when relieving Mullins on break, but claimed “that the reason why he left is because she was staying on break for so long.” (J.A. 167.) Jones also “admitted that he ... was monitoring her break time.” (J.A. 197.) Despite Parker’s and Jones’s admissions and the fact that two co-workers corroborated Mullins’ report, Goodyear concluded that the conflict about which Mullins complained was simply a normal co-worker conflict and not gender-based harassment. (J.A. 157-61.)
*753 Goodyear met with Mullins to inform her of their findings and to scrutinize her work habits, advising her not to take so long when using the bathroom. (J.A. 160.) Summarizing the results of his investigation, Harris told Mullins that “there was [sic] no substantial findings,” (J.A. 158), and that “[h]e found no evidence that the machine had been tampered.” (J.A. 159.) Even though Goodyear admitted that Mullins’ work was “average,” Goodyear determined that her conflict with other coworkers might have been because she was not “busy” enough and her mind might have been “wander[ing].” (J.A. 161.) Rather than conducting a meeting that would address Mullins’ concerns, “it turned into a [Mullins] defending [herself] meeting.” (Mullins Depo., J.A. 266.) “It turned into a why are you not getting enough beads, and we have someone tell us that you do take long bathroom breaks” meeting. (Mullins Depo., J.A. 265-66.)
Neither Jones nor Parker were ever disciplined. (J.A. 328.) Even though Goodyear found two witnesses who corroborated Mullins’ account of Parker deliberately changing spools on Mullins’ machine in order to make her work more difficult, Goodyear never told Parker that he engaged in inappropriate behavior.[8] (J.A. 174.) Whereas Griffith, a Goodyear manager, claimed in his deposition that the separation between Parker and Mullins was lifted after the investigation (J.A. 175, stating that the “restriction had been lifted”), James Harris, another manager, testified that the separation had never been lifted. (J.A. 206.) Likewise, Mullins testified in her deposition that Ray Stevenson, a Goodyear human resource official, told Mullins that Parker would be kept away from Mullins’ work area. (J.A. 259.) Griffith, however, instructed Parker that it “was okay to go back in that area and work, but he needed to limit his dealings with [Mullins].” (J.A. 327.)
Two supervisors, Griffith and Jackie Bone,[9] spent more time in the bead area monitoring the situation. (J.A. 170-71.) According to Griffith, he followed up with Mullins on numerous occasions, and Mullins told him that “it was better.” (J.A. 170-72.) In contrast, Mullins claims that things were not better because Parker continued to lurk in her work area, “constantly walking back and forth behind [her].” (J.A. 117.) Bone admitted that
Mullins complained to him every time Parker came into the bead area, but said that he decided not to report her complaints to anyone else. (J.A. 183.)
Parker continued to spend time in Mullins’ work area despite Mullins’ repeated complaints about the lack of separation. (J.A. 183.) In addition, Parker began driving his equipment dangerously close to her, and Mullins complained about this practice to Bone. (J.A. 185.) However, Bone decided not to inform Human Resources. Id. Parker continued to “constantly walk[ ] back and forth behind [her].” (J.A. 140, 267.) Finally, on Octo *754 ber 27, 2005, Mullins suffered a severe nervous breakdown following two incidents. First, Parker drove his forktruck “within about an inch of [Mullins’] buggy,” causing her to fear for her safety. (J.A. 267-68.) Second, Parker followed her even as she “tried to get away from him.” (J.A. 271.) Eventually, he followed her to the break room where he and Jones physically blocked her exit from the break area. Id.
Mullins “completely fell apart at work” that day, and her husband took her to a physician who advised her husband to “get her out of there.” (JA. 273-74.) Since then, Mullins has been unable to work and was diagnosed with Posh-Traumatic Stress Disorder. (J.A. 330.) She cannot sleep, clean, or cook. (J.A. 278) She has become fixated on the harassment “[b]ecause [she] can’t stop thinking about this. Ever. Ever. It’s all [she] think[s] about.” (J.A. 278, 280-81, 302-03.) She takes Xanax, an anti-anxiety drug, (J.A. 282), and says that she wants to “lay down and go to sleep and never wake up.” (JA. 283.)
II.
This Court reviews a district court’s grant of summary judgment de novo. Williams v. Mehra, 186 F.3d 685, 689 (6th Cir.1999). Summary judgment is appropriate where “the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). In considering “whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law,” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), this Court must construe all evidence in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
III.
The district court dismissed Mullins’ Title VII claim on summary judgment, finding that although the facts alleged created a jury question as to whether the alleged actions were sufficiently severe or pervasive to alter the terms and conditions of her employment, Mullins failed to establish employer liability for coworker harassment. (J.A. 383-405.) On appeal, Mullins contends that the district court erred because it (1) applied the incorrect legal standard for establishing employer liability and (2) ignored key factual disputes that created a genuine material issue to be decided by the jury.
An employer is liable for coworker harassment only if it (1) “knew or should have known of the charged sexual harassment” and (2) “failed to implement prompt and appropriate corrective action.” Hafford v. Seidner, 183 F.3d 506, 513 (6th Cir.1999) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 (6th Cir.1994)). In determining employer liability for coworker harassment, I agree with the majority that the appropriate standard is indifference. Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 338 (6th Cir.2008) (holding that “when coworker harassment is at issue, an employer is not liable for ‘mere negligence,’ but is liable ‘if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known.’ ”).
The district court granted summary judgment for Goodyear because it found that (1) Mullins did not put Goodyear on notice of the sexual harassment (J.A. 404) and (2) Goodyear acted reasonably to end the harassment. (J.A. 404-05.) On appeal, Mullins argues that the district court ignored key factual disputes and errone *755 ously viewed the evidence in the light most favorable to the moving party.
A.
The district court found that Goodyear did not have the requisite knowledge of Mullins’ complaints of sexual harassment because “[Mullins’] statement that she and Jones had ‘issues’ was not sufficient to put [Goodyear] on notice that Jones had allegedly been sexually harassing [Mullins] for years, and it is also not evidence of [Goodyear’s] indifference toward the alleged harassment.” (J.A. 404.)
As mentioned above, in order to establish employer liability for coworker harassment, the plaintiff must first show that the employer knew or should have known of the alleged harassment. Hawkins, 517 F.3d at 338. In determining whether an employer possessed the requisite knowledge of harassment, constructive knowledge is sufficient, id. at 340, and “the plaintiff need not report the offensive conduct of co-workers to prevail.” Wanchik v. Great Lakes Health Plan, Inc., 6 Fed. Appx. 252, 264-65 (6th Cir.2001) (unpublished) (finding that even though plaintiff did not report the co-worker harassment to her employer, there were enough other reports of harassment as to “impute constructive notice to [the] employer”).
The district court and Goodyear claim that there was no knowledge, or even constructive knowledge, because Mullins never complained of the sexual harassment to Goodyear. Although Mullins never told Goodyear that Jones had made remai'ks about her breasts hundreds of times, grabbed and forcibly hugged her, forcibly kissed her, and called her a “stupid bitch,” (J.A.116, 392-93), Mullins attempted to report her previous issues, but Harris, a Goodyear manager, expressly told her not to talk about other issues.[10] (J.A. 116.) With Harris’s explicit direction not to talk about the issues that she had “been having for years,” it was not unreasonable for Mullins to believe that Goodyear did not want to hear about the previous harassment. “An employer cannot avoid Title VII liability for coworker harassment by adopting a ‘see no evil, hear no evil’ strategy.” Ocheltree v. Scollon Prod., Inc., 335 F.3d 325, 334 (4th Cir.2003) (imputing employer knowledge where plaintiff attempted to inform her employer of sexual harassment on several occasions, but the employer refused to listen). When an employer “knew, or upon reasonably diligent inquiry should have known, of the harassment and failed to take immediate and appropriate corrective action,” the plaintiff has satisfied the knowledge requirement. Fleming v. Boeing Co., 120 F.3d 242, 246 (11th Cir.1997) (quoting Faragher v. City of Boca Raton,[11] 111 F.3d 1530, 1535 (11th Cir.1997)).
Here, a reasonable jury could find that (1) Goodyear, knowing that Mullins was being treated differently, that she was the only woman on her shift, and that she and Jones had “had issues for years,” should have made an inquiry as to sexual harassment and (2) Goodyear should not have stopped Mullins from reporting past sexual harassment. If Harris had been at all diligent in discharging his duties as required by Title VII, it would be reasonable to expect that Harris, who admitted that he considered Mullins’ complaint to be “centered around employee-retaliation issues,” (J.A. 190), would have allowed Mullins to report past problems with Parker *756 and Jones in order to determine the cause of that employee retaliation. In short, a reasonable jury could find that Goodyear knew or should have known about the harassment. Whereas an employee has a duty to report sexual harassment, an employer should not be allowed to evade liability by silencing an employee from disclosing past incidents, especially given her reports of workplace harassment.
Because “[sjummary judgment requires the court to view all evidence in the light most favorable to the nonmoving party and is appropriate only if the evidence in the record is so one-sided that no reasonable jury could find for that party,” Hawkins, 517 F.3d at 339 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52, 106 S.Ct. at 2512), we must view the evidence of Goodyear’s knowledge in the light most favorable to Mullins. A reasonable jury could find that Goodyear was at least indifferent to the existence of harassment. The district court discredited the fact that Mullins stated that she and Jones “had issues for years” because “[Mullins] made no effort to explain what the prior ‘issues’ were.” (J.A. 403.) Drawing all reasonable inferences in the light most favorable to Mullins, however, it is reasonable to assume that Goodyear’s discouraging Mullins from explaining why she and Jones had issues for years was not the action of an employer who was reasonable and diligent in preventing and addressing sexual harassment, especially given her complaints that she was targeted by Jones and Parker and because they knew she was the only woman on her shift. Thus, contrary to what the majority glibly concluded, there is a genuine issue of material fact as to whether Goodyear knew or should have known that its employees were sexually harassing Mullins.
B.
Given at least a jury question as to whether knowledge of sexual harassment can be imputed to Goodyear, the next element required to establish employer liability is determining whether the “employer’s response is unreasonable” such that it “manifests indifference or unreasonableness in light of the facts the employer knew or should have known.” Hawkins, 517 F.3d at 340 (citing Blankenship, 123 F.3d at 873). “A response is generally adequate ... if it is ‘reasonably calculated to end the harassment.’” Id. (quoting Jackson v. Quanex Corp., 191 F.3d 647, 663-64 (6th Cir.1999)). “If the employer responds in good faith, it cannot be held liable.” Rudd v. Shelby County, 166 Fed. Appx. 777, 778 (6th Cir.2006) (unpublished) (citing Blankenship, 123 F.3d at 873). “[T]he appropriateness of a response depends on the severity of the alleged harassment.” Blankenship, 123 F.3d at 872.
The district court determined that Goodyear was not indifferent towards the alleged harassment based on the following alleged facts: (1) Goodyear tried to minimize Parker’s contact with Mullins; (2) Griffith and Bone were instructed to increase their supervision of the bead area; (3) Griffith followed up with [Mullins] after the investigation; and (4) Mullins did not give Goodyear an opportunity to respond to further harassment because she did not return to work after Parker drove his forklift close to her and Jones and Parker physically blocked her exit from the break room. (J.A. 404.)
The central flaw in the district court’s and the majority’s analysis is that they ignored key facts and failed to view the evidence, as they were required to do, in the light most favorable to Mullins. First, although the district court stated that Goodyear tried to minimize Parker’s contact with Mullins, it is not clear from the record that Goodyear actually did so. Supervisors Griffith and Bone stated that they imposed a temporary separation dur *757 ing the course of the investigation, (J.A. 151, 182), but accounts differ as to what happened after the investigation. Whereas Griffith stated in his deposition that after the investigation, the “restriction had been lifted,” (J.A. 175), Hams testified that the separation “was not lifted.” (J.A. 206.) Despite Harris’s understanding that the separation was never lifted, Griffith told Parker that it “was okay to go back in that area and work, but he needed to limit his dealings with [Mullins].” (J.A. 327.) Whereas Griffith testified that Mullins repeatedly told him that “things were better,” (J.A. 172), Bone testified that Mullins complained every time Parker came into her area, but that he decided not to do anything about her complaints and consciously decided not to report them to his supervisor. (J.A. 183.) Thus, given the inconsistencies in Goodyear’s testimony, there is a genuine issue of material fact as to whether Goodyear exhibited indifference by failing to minimize Parker’s contact with Mullins.
Second, there is reason to question whether Goodyear responded to Mullins’ initial complaints in good faith. During the course of the investigation, both of Mullins’ witnesses corroborated her report that Parker had sabotaged her machine. (J.A. 199-201.) Mullins’ coworker, Davis, stated that Parker actually laughed and bragged to him about deliberately placing-half-rolls of wire onto Mullins’ machine in order to make her change her wire spools more frequently. (J.A. 350.) Yet Goodyear still concluded that the allegations of machine tampering could not be corroborated. (J.A. 159.) Goodyear disciplined neither Parker nor Jones. Instead, Goodyear decided to turn the tables and subject Mullins’ work record to close scrutiny, questioning her about her bathroom breaks and productivity. (J.A. 161, 265-66.) This scrutiny arose even though Goodyear admitted that Mullins’ work record was “average.” (J.A. 161.) Goodyear’s alleged reason for questioning her work habits was that they thought her complaints might have arisen because was not “busy” enough and her mind was “wander[ing].” Id. Goodyear’s dismissing Mullins’ reports as those of a worker with a “wandering” mind suggests indifference sufficient to create a jury question as to employer liability.
Third, although the district court claims that Goodyear never had an opportunity to respond to Mullins’ complaints prior to her final day of work, it is not clear from the record that this was actually true. As stated above, Goodyear had notice, based on her continual complaints that Parker was in her area, that its “separation” was not working and was bothering her.[12] (J.A. 183.) Bone himself stated in his deposition testimony that Mullins complained about Parker’s presence, stating that “[e]very time that Red was moved back over, [Mullins] said, ‘He ain’t supposed to be over here.’ ” (J.A. 183.)
Mullins also told her supervisor, Bone, that Parker was driving his forklift too close to Mullins and scaring her. (J.A. 185.) Although Goodyear argues that it had no notice of Parker’s use of driving equipment to intimidate Mullins, Bone, her *758 supervisor, plainly testified that Mullins specifically complained about this problem, but that he decided not to inform any other Goodyear supervisors of the problem.
Q. Did she ever complain to you that [Parker] was driving or operating any equipment too close to her?
A. Yes, she mentioned that.
Q. And did you tender that to Human Resources?
A. No.
(Bone Depo., J.A. 185.) Bone, rather than talking to Parker or reporting the complaints to his supervisor, chose to remain silent on the issue until Mullins was almost hit by Parker’s forklift. Because Goodyear did nothing to prevent Parker from engaging in physical intimidation, Mullins was constantly fearful, stating that she “had to keep an eye on [her] machine while it was running, and then, [Mullins] had to keep a constant vigil on wherever Red Parker was because [Mullins] was terrified of Red Parker.” (Mullins Depo., J.A. 269.)
Thus, the district court mischaracterized the facts when it found:
Although [Mullins] now says that Parker and Jones continued harassing her [after the investigation], she did not make any complaints to Griffith or Harris. When [Mullins] told Bone that she thought Parker was in her area more than he should be and that Jones was not relieving her for breaks as he should, Bone addressed those issues with [Mullins], Parker, and Jones. Plaintiff began her medical leave on the same date that she says that Parker drove a forklift close to her and that Jones and Parker stood outside the break room and partially blocked her exit, without giving Defendant an opportunity to address the incidents.
(J.A. 402-03.) In fact, Mullins complained not only about Parker’s continued presence in her work area, but also about Parker purposely driving his fork lift close to Mullins so as to put her in physical danger prior to her last day at Goodyear. Goodyear never responded to Parker’s complaints with any meaningful action.[13]
Although an employer’s response does not have to be perfect in order to be sufficient, (1) ignoring witness corroboration of Mullins’ allegations, (2) subjecting Mullins’ own work record, which was not even an issue, to intense scrutiny, and (3) ignoring Mullins’ continued complaints of Parker’s violations of the post-investigation separation and his driving the fork lift dangerously close to Mullins demonstrates that there is at least a jury question as to whether Goodyear’s response was appropriate and in good faith. In short, a reasonable jury could find that Goodyear’s response “exhibited such indifference as to indicate an attitude of permissiveness that amounts to discrimination.” McCombs v. Meijer, Inc., 395 F.3d 346, 353 (6th Cir. 2005). Given the above factual allegations suggesting that Goodyear refused to hear reports of sexual harassment, never took Mullins’ initial complaints seriously, knew about the ongoing harassment after their investigation, and consciously decided not to do anything about it, there are genuine issues of material fact for which a reasonable jury could find that Goodyear exercised deliberate indifference on coworker harassment.[14]
*759 IV.
Regardless of whether or not individual judges on this panel personally object to sexual harassment claims in general, the district court made a specific factual finding that was fully supported by the record on summary judgment: “[Mullins] has pointed to evidence in the record which would allow the trier of fact to find that the charged sexual harassment had the effect of unreasonably interfering with [Mullins’] work performance and creating an intimidating, hostile, or offensive working environment.” (J.A. 392) (internal quotations omitted). Viewing the facts alleged in the light most favorable to the nonmoving, not the moving, party, the record creates a jury question as to whether defendant Goodyear is liable for the sexual harassment that its employees inflicted on Mullins. The majority, by effectively immunizing employers that are indifferent to such serious and appalling patterns of sexual harassment from Title VII complaints, has scored a substantial victory for all those who believe that women do not belong in the workplace. I dissent.

. Bead operators set up and operate machinery that produce tire beads. (J.A. 56-58.)

. Mullins testified that she was particularly fearful of Parker because he would brag to her about killing people in Vietnam. (Mullins Depo., J.A. 256.) In her affidavit, she recounted that:
Red Parker told me on numerous occasions that he served in Vietnam and that it would be "nothing for me [Parker] to kill someone.” This frightened me because I did not know what he was insinuating. I did not know whether to believe he was crazy or if he was purposefully trying to scare or intimidate me. He is about 6'3" and I estimate lie weighs about 350 lbs or more.
(J.A. 303.) Mullins also told Ray Stevenson, a Goodyear human resources official, that Parker was the type of man who might open fire in a public place like McDonald’s. (J.A. 256.) According to Mullins, Stevenson responded, "She is telling the truth. That is exactly the type of man this is.” (J.A. 256-57.) Harris, another Goodyear official who was present at the meeting, testified that he did not remember Mullins reporting Parker's statements about killing people. (J.A. 208.)

. In his deposition, Davis testified that Parker “was just laughing at how — that he pulled the almost-empty rolls and put on her machine, so she'd have to change them.” (J.A. 350.)

. Griffith testified as to his post-investigation meeting with Parker as follows:
Q. ... did you tell [Parker] that Goodyear had found that he engaged in any kind of inappropriate behavior?
A. No.
Q. Did Harris tell LParker] that Goodyear had found that?
A. No.
Q. Had Goodyear made any findings in that regard?
A. Any inappropriate? No.
Q. Right. Any inappropriate behavior, such as tampering with her gauges, sabotaging her machine, trying to make her work purposely more difficult?
A. No.
(J.A. 174) (emphasis added).

. Bone was the Area Manager for the bead unit, as well as two other departments, making him the direct supervisor of Mullins, Parker, and Jones. (J.A. 55.)

. Another female employee, Lee O’Dell, previously worked on Mullins' shift, but transferred specifically "to get away from [Jones and Parker]” because “it was horrible.” (J.A. 262.)

. Faragher was later reversed on other grounds. Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

. Although Goodyear claimed that just complaining about someone’s presence is not a complaint of actionable harassment, it is significant that Parker continued to hang around Mullins’ work area even though, in taking the facts in the light most favorable to Mullins, that separation was not lifted. Parker’s continued presence, therefore, was evidence of open disobedience, and Goodyear’s failure to address his refusal to maintain a separation from Mullins suggests deliberate indifference to Mullins' underlying complaints of harassment. Moreover, Mullins did not merely complain about Parker’s presence. As discussed below, Mullins also complained to her supervisor, Bone, that Parker was driving his vehicle too close to Mullins, making her fear for her physical safety.

. The majority’s inaccurate statement that “Goodyear did not have the opportunity to address [Mullins'] final working-day concerns” is thus directly and irreconcilably contradicted by the fact that Mullins had complained about Parker driving dangerously close to her person well before her final day at work.

. Although Goodyear and the majority argue that Goodyear’s remedial actions were adequate because Mullins focused on Goodyear's failure to stop Parker, not Jones, from con *759 tinuing his harassment, Appellee br. p. 29, this argument is not particularly cogent. Mullins complained about both Parker and Jones, and both Parker and Jones were involved in the final incident that led to her breakdown.