*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0243p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DONNA RANDOLPH,

　　　　　*Plaintiff-Appellant,*

　　　*v.*

OHIO DEPARTMENT OF YOUTH SERVICES,

　　　　　*Defendant-Appellee.*

No. 04-3468

>

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-01253—George C. Smith, District Judge.

Argued: September 16, 2005

Decided and Filed: July 13, 2006

Before: CLAY and GIBBONS, Circuit Judges; STEEH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Alexander M. Spater, SPATER LAW OFFICE, Columbus, Ohio, for Appellant. Jack W. Decker, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Alexander M. Spater, SPATER LAW OFFICE, Columbus, Ohio, for Appellant. Jack W. Decker, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

## OPINION

---

　　　　JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-appellant Donna Randolph filed a complaint in United States District Court for the Southern District of Ohio against the Ohio Department of Youth Services, asserting claims of sex discrimination, hostile-work-environment sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The district court granted the Ohio Department of Youth Services's motion for summary judgment in its entirety. Randolph now appeals.

　　　　For the following reasons, we reverse the decision of the district court and remand the case for further proceedings.

---

[*]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

I.

Randolph's claims arise out of her employment with the State of Ohio as a food service worker in the Circleville Youth Center ("CYC") from April 1995 until December 1996. CYC is an all-male, maximum-security youth intake facility. Donald Feldkamp, CYC's superintendent, initiated a cadre program at CYC in 1995 that was designed to provide job training to inmates who were nearing their release dates. A few cadre members were assigned to the kitchen, where they worked directly alongside Randolph and other food service workers. The events giving rise to Randolph's lawsuit stem from her interaction with the cadre members in the kitchen.

Initially, we note that there is much conflicting evidence in the record about Randolph's interaction with cadre members. We make no effort to summarize it all but instead focus on the evidence produced by Randolph in opposing summary judgment because it is the sufficiency of this evidence that governs our analysis.

Randolph claimed in her deposition that the cadre members daily listened to music with lyrics that were degrading to women and used body language that was offensive to the female workers. Additionally, Randolph and other workers stated in deposition testimony that the cadre members used offensive language to address the female workers and to describe their bodies and that they directed the foul language only toward the female workers. Randolph stated in her deposition that while she believes that she and other female workers complained about these issues, the cadre members' behavior did not interfere with her work life because she was a hard worker. Nonetheless, Randolph claimed in her deposition that CYC failed to adequately address the complaints. In addition, Sandra Fletcher, another food service worker, stated in her deposition that supervisor Doug Smith verbally castigated and physically threatened her for complaining about a cadre member. Randolph also claimed in her deposition that complaints about the cadre members' behaviors often exacerbated those behaviors and Fletcher and Joanna Tinney, another food service worker, testified that the verbal harassment escalated and became far more threatening over time.

According to Randolph's testimony, the harassment eventually became physical. She testified that JH, one of the inmates, tried to sexually assault her. JH came upon her as she was walking toward the staff bathroom and put something that she feared was a knife against her back. Randolph testified that JH forced her into the bathroom and shut and locked the door. JH ordered her to pull down her pants, but there was a sudden knock on the door. JH left, telling Randolph not to come out until she heard another knock at the door. Randolph did not immediately report the encounter.

Randolph testified that JH sexually assaulted her on a second occasion in May 1996. JH again forced her into a staff bathroom and shut and locked the door once inside. JH turned her around, hitting her head against the mirror, and got on top of her. Randolph's testimony is unclear as to whether penetration occurred; she stated that she may have "blocked it out." JH left the bathroom when he heard a knock on the door and told Randolph not to leave until she heard another knock. Randolph again failed to immediately report the assault to anyone at CYC.

Randolph testified in her deposition that subsequent to the alleged sexual assault, the inmates began taunting and verbally harassing her about the incident. Randolph told two of the inmates to tell JH that she was going to report both encounters. JH later found Randolph and was infuriated. Randolph testified that he threw her against a kitchen appliance and lifted her off the floor by the throat. Tinney observed the altercation and in her deposition corroborated Randolph's account of the events. Doug Smith entered the room and witnessed this event, but described it in his deposition as "horseplaying." Smith did not talk to either Randolph or JH about the incident, nor did he report it or investigate it further because he thought that the event was merely horseplay.

On June 4, 1996, while Randolph was on vacation, Tinney reported the altercation between JH and Randolph to supervisor Donna Carpenter but asked Carpenter not to tell anyone else. Carpenter stated that she discussed this report with Smith. Smith acknowledged witnessing the event but reported that it appeared to him to be mere horseplay. Carpenter credited Smith's response and found Tinney untrustworthy, so she did not pursue the matter further. Tinney also reported the attack to Mike Logan, who was in charge of indirect services at CYC and who reported directly to Feldkamp. At that time, Tinney also informed Logan that other food service workers had been continuously subject to verbal sexual harassment since the "horseplay" incident. According to Tinney's testimony, Logan stated that he could not pursue the allegations because Randolph had failed to file a report.

On June 8, 1996, Tinney and Rose Harman, Randolph's sister,[1] took Randolph to see Logan and Jim Greek, another CYC administrator. At this time, Randolph reported the choking incident but did not report either the alleged sexual assault or the alleged attempted sexual assault because she felt "dirty and ashamed and disgusting" and did not want others to know about it. Both Randolph and Tinney gave Logan a written statement of the assault. Soon after the report, JH pressed himself against Tinney's back and threatened to harm her should she report the incident. Randolph was also threatened by other cadre members.[2] As a result of these reports, JH was put on house arrest and removed from kitchen duty. At some later point, Randolph went into Logan's office, crying, and told him that she had been raped.

Labor Relations Officer Aiesha Saunders investigated Randolph's reporting of the choking incident. Saunders did not interview Randolph, but her investigation uncovered rumors that Randolph had engaged in inappropriate sexual behavior in front of the inmates. As a result, Saunders recommended that the Highway Patrol conduct a formal investigation into any impropriety by Randolph. Upon receiving this recommendation, Feldkamp reported the allegations of Randolph's inappropriate behavior and a possible consensual sexual relationship between Randolph and JH to the Department of Youth Services' Chief Inspector's Office and the Ohio State Highway Patrol. This resulted in a criminal investigation, conducted by Trooper Don Whipple, to determine whether Randolph had violated Ohio Revised Code § 2907.03, which criminalizes engaging in sexual activity with a person who is in state custody. Whipple concluded that there had been a consensual sexual encounter between JH and Randolph and referred the case to the Pickaway County Prosecutor. The prosecutor found the evidence insufficient to prosecute and took no action.

Saunders's recommendation also resulted in an investigation by Rebecca Martin of the Chief Inspector's Office. At the end of her investigation, Martin concluded that Randolph was not a credible witness and that the sexual encounters seemed to be consensual. Martin found especially suspect Randolph's decision to report the choking incident well in advance of the sexual assault and attempted sexual assault.

On approximately July 17, 1996, Harman checked Randolph into Harding Hospital in Columbus, Ohio, because Harman believed that Randolph was suicidal. Randolph was placed on administrative leave. After she was released from the hospital, Randolph sought counseling. Randolph's administrative leave ended on July 25, 1996. Randolph was then required to use sick, vacation or personal time to remain away from work. Randolph applied for and was granted disability benefits, which consisted of a portion of her regular income.

---

[1]Harman was secretary to Ralph Dowling-Fitzpatrick, who was in charge of direct services at CYC and who reported to Feldkamp.

[2]Specifically, Randolph alleges that an inmate told her that she had engaged in sexual intercourse with a German shepherd and that the same inmate told her that she was "going to get it." Randolph reported these and other instances of verbal harassment.

The CYC decided to take disciplinary action against Randolph. A pre-disciplinary meeting was scheduled for October 3, 1996, but was postponed because Randolph's psychiatrist, Dr. Kevin Ware, stated that Randolph was "under a large amount of stress" and that the meeting "would be detrimental to her condition." Ware requested that the meeting be postponed for at least six months. Despite this request, the meeting was rescheduled for November 14, 1996, and occurred without her being present. On December 13, 1996, CYC terminated Randolph. Randolph filed a grievance, and an arbitrator reinstated her on March 15, 1998. Randolph applied for and was granted a transfer shortly after her reinstatement.

Randolph filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") on January 3, 1997. The EEOC determined that enough evidence had been uncovered during the investigation to establish a Title VII violation and issued a right to sue letter. On December 13, 2001, Randolph filed a complaint in United States District Court for the Southern District of Ohio, alleging hostile-work-environment sexual harassment, sex discrimination based on disparate treatment,[3] and retaliation in violation of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.* CYC moved for summary judgment on all claims. On March 15, 2004, the district court granted CYC's motion with respect to all claims. Randolph filed a timely notice of appeal on April 13, 2004.

II.

This court reviews a district court's grant of summary judgment *de novo*. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We must view the evidence and draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

III.

On appeal, Randolph first argues that the district court erred in holding that "Randolph's charges for a sexually hostile work environment prior to May 1, 1996 are barred for failure to exhaust administrative remedies." The district court so held because in Randolph's charge of discrimination filed with the EEOC, she stated that the earliest date of discrimination was May 1, 1996. The district court therefore ruled that Randolph had failed to exhaust her administrative remedies with regard to those actions occurring prior to May 1, 1996. Though Randolph's evidence regarding events occurring after May 1, 1996, is by itself sufficient to support our holding that summary judgment was improvidently granted in this case, we hold that the district court erred in excluding evidence of prior acts.

A person seeking to bring a discrimination claim under Title VII in federal court must first exhaust her administrative remedies. *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976). This requirement exists so that the EEOC will have an opportunity to convince the parties to enter into voluntary settlement, which is the preferred means of disposing of such claims. *Parsons v. Yellow Freight Sys., Inc.*, 741 F.2d 871, 873 (6th Cir. 1984). The requirement, however, is not meant to be overly rigid, nor should it "result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in

---

[3]Although Randolph's complaint states that she was subject to "sex discrimination," the district court granted summary judgment on this claim. On appeal, Randolph's brief fails to raise any argument alleging sex discrimination. This claim is therefore waived. *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 478 (6th Cir. 2005).

a judicial pleading." *EEOC v. McCall Printing Co.*, 633 F.2d 1232, 1235 (6th Cir. 1980). As a result, the EEOC complaint should be liberally construed to encompass all claims "reasonably expected to grow out of the charge of discrimination." *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992) (internal quotation marks and citation omitted).

The district court's holding that Randolph failed to exhaust her claims prior to May 1, 1996, was improper because Randolph is not making a separate claim for actions prior to that date. The district court's holding bifurcated Randolph's hostile-work-environment claim and held one of the claims exhausted. Hostile work environment claims by their very nature require ongoing conduct, however. *See Bell v. Chesapeake & Ohio Ry. Co.*, 929 F.2d 220, 223 (6th Cir. 1991) ("[M]any discriminatory acts occur in such a manner that it is difficult to define precisely when they took place. One might say they unfold rather than occur." (internal citations omitted)). This case is no exception. Randolph's allegations are not bounded by discrete temporal boundaries, but rather describe an escalating progression of harassment. Thus, the actions prior to and after May 1, 1996, all support Randolph's single claim. As a result, the district court's holding misconstrued both the nature of the evidence presented and the nature of Randolph's claim. As the pre-May 1, 1996, actions do not constitute a separate claim, the district court's exhaustion holding was incorrect.

The district court's holding is more accurately described as evidentiary in nature. Although the court couched its ruling as relating to exhaustion, the court fundamentally held that the events occurring prior to May 1, 1996, were outside the scope of the EEOC claim and thus irrelevant. To the extent that it did so and excluded evidence of events prior to May 1, its conclusion was also incorrect for two reasons. First, the actions prior to May 1, 1996, are not beyond the scope of the EEOC complaint, as the EEOC could reasonably be expected to investigate those actions notwithstanding the date listed on the face of Randolph's complaint. *See EEOC v. Roadway Express, Inc.*, 261 F.3d 634, 642 (6th Cir. 2001) ("[T]he Supreme Court has held that Title VII gives the EEOC very broad powers of investigation and affords the EEOC access to 'virtually any material which might cast light on the allegations against the employer.'" (quoting *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68-69 (1984))). Second, the ongoing nature of hostile-work-environment sexual harassment claims undergirds our "totality of the circumstances" review of these claims. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658-59 (6th Cir. 1999). As noted above, this case is no exception, and the imposition of an artificial cut-off of May 1, 1996, would exclude evidence relevant to the totality of the circumstances. The EEOC complaint cannot be read as a temporal limitation on the admission of evidence for the hostile work environment claim. As a result, we consider the events alleged both before and after May 1, 1996, in reviewing Randolph's hostile-work-environment claim.

Randolph next argues that the district court erred in finding that she had not raised a genuine issue of material fact about whether she was subjected to a hostile work environment. Under Title VII, in order to make out a hostile-work-environment claim based on sexual harassment, an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) ("'The elements and burden of proof are the same, regardless of the discrimination context in which the claim arises.'" (quoting *Crawford v. Medina Gen'l Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996))). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). Both an objective and subjective test must be met; in other words, the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim. *Id.* at 21-22.

Rather than considering each event complained of in isolation, we must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive. *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). Specifically, we must consider "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Harris*, 510 U.S. at 23. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). We may, however, consider the effect of the incidents on the employee's psychological well-being. *Harris*, 510 U.S. at 23.

CYC conceded before the district court that Randolph is a member of a protected class and has produced evidence of unwanted sexual harassment, so Randolph has satisfied the first two elements of the hostile work environment claim. The sufficiency of Randolph's evidence of the remaining three elements, however, is in dispute.

The district court found that Randolph satisfied her burden to present evidence that the harassment was because of sex. We agree, but find that the district court erred by examining the evidence of verbal and physical harassment separately in its analysis of the third element. The district court found that, while the *verbal* abuse and rumors of which Randolph complained were not "because of sex" as required by Title VII, the *physical* abuse–specifically the choking incident, the attempted sexual assault, the completed sexual assault, and the physical contact accompanied by threats–was sufficiently gender-based to satisfy the third prong. Differentiation between verbal and physical harassment violates the principle that the "totality-of-the-circumstances examination should be viewed as the most basic tenet of the hostile-work-environment cause of action." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). It is therefore error to distinguish between the various forms of harassment; as long as Randolph was subjected to a hostile environment at CYC because of her sex, she has met the third element of her claim.

Given the totality of the circumstances here, the evidence that the physical abuse was gender-based permits an inference that the verbal abuse was also "because of sex." When this inference is considered along with Randolph's direct evidence of explicitly sexual verbal abuse, we find that Randolph has easily presented sufficient evidence to satisfy the third element. Randolph testified in her deposition that she was subject to daily threats, derogatory comments, verbal harassment, foul language, and several serious physical assaults to which members of the opposite sex were not exposed. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring))). Together, this evidence is sufficient to allow us to find that Randolph has satisfied the third element of the hostile work environment claim.

Next, Randolph must present evidence as to the fourth element of the hostile work environment test – that the harassment created a hostile work environment, in that it was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21. The district court again found that while the verbal harassment did not objectively create a hostile work environment, the physical harassment did suffice to meet the fourth element. For the same reasons stated above, the district court erred in evaluating the allegations independently rather than considering the totality of the circumstances as required under prevailing case law.

Randolph has easily satisfied her burden to produce evidence from which a hostile work environment can be found. As noted above, Randolph testified that she was subjected to daily verbal harassment and threats and produced evidence corroborating her testimony. Additionally,

Randolph testified that she was subjected to multiple physical attacks and produced evidence corroborating her testimony. These events would certainly be traumatic to any individual and were clearly traumatic to Randolph, based on her evidence that they caused her to become suicidal and necessitated institutionalization and counseling.

The fact that Randolph was employed in a prison is not sufficient to overcome the allegations of hostility presented in this case. As the district court noted, "[p]risoners, by definition, have breached prevailing societal norms in fundamentally corrosive ways," and thus "[b]y choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate and socially deviant behavior." *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000). The *Slayton* principle that corrections personnel have accepted the probability of deviant behavior is not without limit, however. Randolph's allegations are so serious that they satisfy the hostile work environment prong despite the mitigating consideration of the prison work environment. We therefore find that Randolph has presented evidence sufficient to satisfy the fourth element of a hostile work environment claim.

Finally, Randolph must establish employer liability. *Hafford*, 183 F.3d at 512. In order to show employer liability based on a hostile work environment created by inmates, Randolph must show that "the institution fail[ed] to take appropriate steps to remedy or prevent illegal inmate behavior." *Slayton*, 206 F.3d at 677. The district court held that Randolph failed to meet this standard because CYC took appropriate corrective action by removing JH from kitchen duty after Randolph was attacked. The district court also held that Randolph had failed to present sufficient evidence from which to find that CYC had actual or constructive notice of the hostile work environment.

The district court erred in its holding as to liability. First, Randolph has presented sufficient evidence to survive summary judgment on the question of whether CYC had actual or constructive notice of the harassment. Randolph testified that she and her food service co-workers complained about the verbal harassment on several occasions to supervisors to no avail. Randolph's testimony also indicated that the supervisors were aware of the harassment but largely ignored it. In fact, as Tinney alleged, supervisors instructed the food service workers to stop complaining. More troubling than CYC's lukewarm response to the verbal harassment, however, is its response to Randolph's allegations of physical assault. While Randolph did not report these incidents immediately after they occurred, it is undisputed that she did eventually report both the choking incident and the two sexual assaults. Therefore, Randolph presented evidence sufficient to establish that CYC had actual notice of the hostile work environment to which she was subjected. The district court focused on the fact that Randolph failed to report the incidents in accordance with CYC's sexual harassment policy, on which Randolph had received two to three weeks of training. While we may consider Randolph's failure to file a formal complaint in accordance with the CYC procedure in determining whether CYC knew of the harassment, that failure does not absolutely bar Randolph's claim, nor does it prevent the claim from proceeding where the record reflects that CYC was clearly apprised of the harassment. *See Jackson*, 191 F.3d at 663 (failure to report harassment did not bar a hostile work environment claim because the requirement is that the employer knew or should have known of the offensive conduct, not that the employee must report it). We therefore find that Randolph presented evidence that CYC had notice of the harassment.

With regard to whether CYC's response to the harassment was adequate, Randolph has again presented sufficient evidence to permit a finding that CYC failed to take appropriate steps to prevent the harassing behavior. Once CYC learned of the choking incident, JH, the perpetrator, was removed from the kitchen and placed on some restrictions for the remainder of his time at CYC. While it appears that Randolph had no contact with JH following these measures, Randolph testified that she was still subject to harassment and rumors from other inmates relating to the attack. Thus, it appears that a factfinder could determine that merely removing JH from the kitchen was

insufficient to prevent the hostile work environment from continuing, as required for CYC to avoid liability under *Slayton*. 206 F.3d at 677. Furthermore, Randolph's reporting of the physical assaults led to a barrage of rumors that Randolph was engaging in a consensual sexual relationship with inmates and had behaved in inappropriate ways at work. These rumors led to two investigations which ultimately resulted in Randolph's termination. If Randolph's evidence is accepted, CYC's response to Randolph's reports of assault by inmates seems patently inadequate to "remedy or prevent illegal inmate behavior." *Slayton*, 206 F.3d at 677. As a result, Randolph has presented sufficient evidence to raise a genuine issue of material fact as to whether she was subject to a hostile work environment, and we therefore reverse the district court's holding on this issue.

IV.

Randolph argues next that the district court erred in granting summary judgment in CYC's favor on her Title VII retaliation claim. In order to establish a *prima facie* case of retaliation, the plaintiff must show that: (1) she engaged in activity protected under Title VII; (2) the defendant knew that she engaged in the protected activity; (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected. *Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004); *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. ___, No. 05-259, Slip Op. at 13 (2006) ("[T]he anti-retaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment.").

Randolph identifies three protected activities in which she engaged to satisfy the first element: (1) her report to the administration that JH had choked her; (2) her complaint that another inmate had verbally harassed her by telling her that she had engaged in sexual activity with a dog; and (3) her reports of sexual assault. Because Randolph reasonably believed that her actions in reporting the harassment were protected activity, she satisfies the first element of her retaliation claim. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000).

Second, Randolph must show that CYC knew she was engaging in protected activity. As noted above, it is undisputed that Randolph complained several times about the verbal and physical assault. Particularly with regard to the allegations of sexual assault, CYC must have known that Randolph was exercising a protected right under Title VII in making the report. Therefore, the second element is satisfied.

Randolph must next show that CYC took an adverse, retaliatory action against her after the reporting. Randolph cites CYC's actions in placing her on administrative leave and then terminating her employment as the adverse actions. The district court held that because she was reinstated with seventy-percent back pay, she could not establish that she had been subject to an adverse action.

Not every act affecting an individual's employment can be considered an adverse, retaliatory action giving rise to liability. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (noting need for tangible employment action to support vicarious liability discrimination claim). Instead, to support a Title VII claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. ___, Slip Op. at 13 (internal quotation omitted). In determining whether an employee's change is material, we must consider the context of the action. *Id*. at 14. In this case, Randolph was first placed on administrative leave, then terminated. She was later reinstated with seventy-percent back pay. In this case, as in *Burlington Northern*, the termination and concomitant loss of income constitutes a materially adverse action under Title VII, notwithstanding Randolph's later reinstatement with back pay. *See id.* at 18 ("White did receive backpay. But White and her

family had to live for 37 days without income.  They did not know during that time whether or when White could return to work.  Many reasonable employees would find a month without a paycheck to be a serious hardship.").  Therefore, the district court erred in finding that Randolph had failed to establish an adverse employment action and Randolph satisfied the third element.

Fourth, Randolph must establish that there was a causal connection between the adverse employment action and the protected activity.  *Morris*, 201 F.3d at 792.  The district court declined to reach this issue based on its ruling that Randolph had not suffered an adverse retaliatory action.  Randolph points to the temporal proximity between the reporting of the harassment and her termination in support of the causal connection.  Randolph reported the assaults in June and July 1996, was placed on administrative leave on June 17, 1996, and was terminated on December 13, 1996.  Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection.  *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 363-64 (6th Cir. 2001); *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000).  In this case, the timing of Randolph's placement on administrative leave and eventual termination is coupled with the fact that she was subjected to rumors about inappropriate behavior between her and the inmates that led to two investigations of her conduct.  These investigations were not to determine whether Randolph had been subjected to a hostile work environment, but rather were conducted with the purpose of inquiring into whether *Randolph* had engaged in any inappropriate behavior.  These circumstances are sufficient to support a finding by the panel that Randolph had satisfied the third prong, thereby satisfying her *prima facie* burden for retaliation.  As a result, we reverse the ruling of the district court on this issue.[4]

V.

For the foregoing reasons, we **REVERSE** the decision of the district court's opinion granting summary judgment in favor of the Ohio Department of Youth Services and **REMAND** the case for further proceedings.

---

[4]Ordinarily, we would be required to consider whether CYC could produce a legitimate, non-retaliatory reason for the adverse action taken against the plaintiff.  *West v. Fred Wright Const. Co.*, 756 F.2d 31, 33-34 (6th Cir. 1985).  We would next have to consider whether the plaintiff could establish that the reason proffered by the defendant was merely pretextual and that the actual reason was retaliation for her engaging in a protected activity.  *Id.* at 34.  However, neither party's brief addresses any argument beyond the *prima facie* case, so there is no proffered legitimate non-retaliatory reason for the panel to consider.