NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  06a0698n.06
Filed:  September 26, 2006

No. 05-6517

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ELIZABETH HANLEY,                                )
                                                 )
    Plaintiff-Appellant,                       )
                                                 )
v.                                               )    ON  APPEAL  FROM  THE  UNITED
                                                 )    STATES DISTRICT COURT FOR THE
CHEVY CHASER MAGAZINE, LLC, and                  )    EASTERN DISTRICT OF KENTUCKY
CHARLES CREACY, Individually,                    )
                                                 )
    Defendants-Appellees.                      )
                                                 )

Before:  MERRITT, SUTTON and GRIFFIN, Circuit Judges.

PER CURIAM.  Elizabeth Hanley challenges the district court's order granting summary judgment on her state-law hostile work environment and intentional infliction of emotional distress claims. Because Hanley has established genuine issues of material fact with regard to each claim, we reverse.

I.

Chevy Chaser Magazine, LLC, is a small Kentucky limited liability corporation, which employs roughly ten people and is co-owned by Charles Creacy and Chris Eddie.  The company publishes two local magazines on a monthly basis (Chevy Chaser Magazine and Southsider Magazine) and operates a small print shop.  The company hired Elizabeth Hanley in February 2002

as a salesperson. Hanley had no prior experience in publishing and was hired in part as a result of her friendship with Creacy's wife, Susan, who had attended high school with Hanley and who maintained a close friendship with her.

Creacy was the company's chief salesperson and performed supervisory duties (including directly supervising Hanley) while Eddie supervised the publication and design of the magazines. Amber Scott was the editor of both magazines and also supervised Hanley. The company eventually promoted Hanley to sales manager, where she remained until the company discharged her on November 29, 2003.

In the months preceding Hanley's discharge, Creacy allegedly engaged in the following conduct:

- In late August, at the office (and in the presence of other employees), Creacy told Hanley that "he would like to masturbate" with her blouse. JA 113. Creacy admits making a "lewd joke" about Hanley's shirt that "implied masturbation" even if he did not use the word. JA 262. And in early September, Creacy made a similar comment to Hanley at a restaurant where several employees had gathered after a work function.

- At the office, while discussing a problem with Hanley, Creacy told her that resolving it didn't matter because "you look so damn good." JA 122. Hanley discussed this incident with Scott, who told her "that he had made comments to her as well about things she had been wearing lately," including that "he wanted to bite her right calf" when she wore a skirt one day. JA 123. On another occasion, Creacy commented that Hanley's new haircut "showed off her neck and that he might want to nibble on her neck or kiss her neck." JA 677. Such comments were not uncommon during this time period, as Creacy would "make comments about the way our butt looked in a pair of pants," for example, JA 125, and it got to the point where Hanley felt so uncomfortable that she "didn't know what to wear to work." JA 123.

- "Probably twice a week" during this period Creacy recounted his sexual exploits with his wife in graphic detail at the office. JA 679–80.

- Beginning in early September and continuing throughout the fall, Creacy flaunted his affair with fellow employee Rose Deller. Hanley first recognized the situation when Creacy told her at the office that Deller had told him she "would [have sex with] him." JA 137. Thereafter, Creacy and Deller were "whispering all the time," she "started dressing like a prostitute," JA 140, and they would go to lunch privately, JA 667. "Everybody felt . . . the sexual tension that was produced because of [Creacy] and Deller." JA 668.

- On October 3, at a local race track, Creacy "grabbed [Hanley's] butt" and the butts of "[o]ther [employees]." JA 119. In response, Hanley "smacked his arm." JA 120. Everyone from the office was at the track that day, as "[t]he office was closed" and Creacy and Eddie "gave [the employees] 20 bucks to gamble with." JA 697. Creacy "recall[s] grabbing some butts" that day but recalls doing so at the office prior to leaving for the race track. JA 264.

- At dinner following the day at the race track, Creacy exchanged sexual looks and acts with Deller, including placing "their feet in each other's crotches." JA 144.

- Creacy exchanged sexually explicit emails with Deller using their business email accounts. Scott discovered some of these while using Deller's computer (which was her old computer) on October 10. "Everybody could use anybody's computer in the office. It wasn't a big deal." JA 146. Scott was upset by these emails, continued monitoring Deller's email account and shared printed-out emails with the other women in the office, including Hanley. Although Scott confronted Creacy about his relationship with Deller, she didn't disclose her possession of the emails prior to Hanley's termination. After reading these emails, Hanley "wasn't in the office very much," "wasn't sleeping a lot," "wasn't eating" (she dropped six dress sizes) and "could not do [her] job effectively." JA 157–58. Following Creacy's confrontation with Scott (which occurred in mid-October, JA 491), Creacy and Deller's behavior "got a little bit more quiet and sedated, but it didn't stop." JA 495.


In discharging Hanley on November 29, 2003, the company explained that she was having problems with several of the accounts she managed. Hanley does not deny the existence of these problems but attributes them to her inability to work effectively due to the above incidents in the office.

Following her termination, Creacy (after investigating irregularities in Hanley's accounts) filed a criminal theft complaint against Hanley on December 22, 2003. The jury returned a verdict in Hanley's favor on May 3, 2005.

While the criminal charge was pending, Hanley filed a complaint against Chevy Chaser and Creacy in state court. The complaint alleged unlawful sexual harassment and retaliation under Title VII and the Kentucky Civil Rights Act (against Chevy Chaser), as well as the Kentucky common-law tort of intentional infliction of emotional distress (against Creacy). The defendants removed the case to federal court. Hanley eventually dropped the Title VII claim, and the district court rejected the remaining claims as a matter of law. On appeal, Hanley challenges only the dismissal of the state-law hostile work environment and intentional infliction of emotional distress claims.

## II.

We review the district court's grant of summary judgment de novo. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 731 (6th Cir. 2006). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a summary judgment decision, we view the evidence in the light most favorable to the non-moving party—Hanley. *Randolph*, 453 F.3d at 731.

## A.

Hanley first challenges the district court's disposition of her state-law, hostile-work-environment claim. *See* Ky. Rev. Stat. § 344.010, *et seq*. That statute prohibits employers from "discriminat[ing] against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex . . . ." *Id.* at § 344.040(1). "[I]n consonance with Title VII," *American General Life & Acc. Ins. Co. v. Hall*, 74 S.W.3d 688, 691 (Ky. 2002), a hostile workplace under Kentucky law is one "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 798 (Ky. 2000) (internal quotation marks omitted). Among other misconduct, a hostile work environment includes "'unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 821 (Ky. 1992) (emphases omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). In determining whether the plaintiff has established that such an environment exists, the factfinder must consider all of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Ammerman*, 30 S.W.3d at 798 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)).

Several of Hanley's allegations, as the district court correctly found, do not properly bear on her hostile-work-environment claim: the alleged affair between Creacy and Deller, the emails exchanged between Creacy and Deller and Creacy's (non-sexual) behavior toward other employees.

*See* Dist. Ct. Op. at 11–12. Creacy's affair with Deller was simply not an act of harassment directed at Hanley. While Hanley had every reason to be distressed by the apparent existence of an affair involving her best friend's husband, she has not shown how the existence of that relationship subjected her to a hostile work environment. The emails between Creacy and Deller were meant to be private, and Creacy was not responsible for Hanley's discovery of them. Finally, Hanley's allegations of aggressive workplace conduct—that Creacy "would berate [an] employee in front of others, would not speak to them and made them feel uncomfortable," Hanley Br. at 6—establish that the conduct by its context was not because of sex. *See* JA 128–29 (identifying "Joseph Thompson" and "Todd Mercier" as two male victims of this behavior).

As to the remaining allegations, however, we part ways with the district court. From late August 2003 through Hanley's discharge in late November 2003, Hanley set forth evidence that establishes a triable issue of fact about the existence of a hostile work environment. To begin, Hanley stated that Creacy's discriminatory conduct was consistent and pervasive, and another employee (Scott) bolstered those allegations. Both women testified through depositions that Creacy frequently made sexually aggressive comments about their clothing, and Scott testified that he frequently regaled them with stories of his sexual exploits. *See Meyers*, 840 S.W.2d at 823 (explaining that third-party descriptions of work environment are relevant to "to show why [the victim] believed she was working in a sexually hostile work environment"); *see also Wanchik v. Great Lakes Health Plan, Inc.*, 6 Fed. App'x 252, 262 (6th Cir. 2001) (holding that "episodes of

harassment concerning other women are probative [of] plaintiff's experience" so long as plaintiff is aware of the alleged incidents).

Considered in its entirety, moreover, Creacy's conduct amounts to more than garden-variety bad taste. By physically grabbing Hanley and her co-workers, he went beyond sexually threatening remarks to sexually offensive contact. And several of his comments, such as his expressed desire to masturbate with Hanley's shirt and nibble on her neck, were tinged with physically threatening overtones. Creacy's storytelling also reached a level of vulgarity that could fairly affect an employee's capacity to continue to work. *See* JA 679–80 ("He would say he came home last night and he bent Susan over the kitchen sink and they f\*\*\*ed . . . ."). Taken together, these incidents would permit the jury to find a hostile work environment. *See Ammerman*, 30 S.W.3d at 798 (stating that existence of harassment must be determined by "looking at all the circumstances") (internal quotation marks omitted); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 564 (6th Cir. 1999) (reversing summary judgment for defendant on hostile environment claim because "a work environment viewed as a whole may satisfy the legal definition of an abusive work environment . . . even though no single episode" is sufficient).

Finally, the severity and pervasiveness of Creacy's conduct reasonably could (and allegedly did) interfere with Hanley's work performance. His sexually themed comments about Hanley's clothing taken alone altered her work environment, causing her to have trouble deciding how to clothe herself each day. His other behavior only added to the discomfort and offense caused by these remarks. Hanley's reaction was not unreasonable, as Scott's testimony supports the contention that

the work place was highly sexually charged, and the small, tight-knit nature of the office understandably heightened the impact of Creacy's conduct. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.").

Kentucky precedent lends support to this conclusion. In *Meyers*, the plaintiff's supervisor used "language loaded with obscenity and sexual innuendo," addressed some comments "directly to" plaintiff, suggested that women were unfit workers and generally exhibited a "sexually demeaning attitude towards women [that] pervaded the whole sales operation." 840 S.W.2d at 822. *Meyers*, indeed, would appear to be the harder case because (unlike here) there was no evidence that the plaintiff's supervisor initiated physical contact or made physically threatening remarks. *Cf. Ammerman*, 30 S.W.3d at 800 (affirming dismissal of hostile work environment claim because "a single off-color comment . . . is legally insufficient to constitute actionable sexual harassment").

By contrast, each of the Sixth Circuit cases upon which the company relies involves conduct that fairly may be labeled as "sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks omitted). In *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir.), *cert. denied* 522 U.S. 865 (1997), summary judgment was granted because the complained-of behavior consisted of "merely offensive" comments made at twice-monthly meetings over a four-month period. *Id.* at 826–27. Not only were these comments more isolated than Creacy's alleged misbehavior, but the *Black* defendants also

failed to engage in any unwanted physical contact or make physically threatening remarks. Much the same can be said for the defendants in *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000). There, the court affirmed summary judgment where the "sum total" of acts alleged included "several dirty jokes," one "alleged verbal sexual advance," a "*one-time* reference to plaintiff as 'Hot Lips'" and "*isolated* comments about plaintiff's state of dress." *Id.* at 790 (emphasis added).

The company's other arguments generally go to the weight of the hostile-environment evidence, not to its existence. The employer, for example, points to Hanley's own engagement in activities of a sexual nature to suggest that Creacy's conduct could not have altered the conditions of her employment. Hanley, it is true, acknowledges requesting Eddie to play a vulgar song, briefly going to a strip club with Creacy and his wife at their bachelor/bachelorette party, going to an adult novelty store with Creacy and his wife on one night as a joke and discussing the sexual content of a movie at the office. None of these incidents, however, offers any suggestion that Hanley would welcome physically harassing conduct. And because a reasonable jury could find that someone who engaged in these activities could nevertheless perceive Creacy's conduct to create a hostile environment and that Hanley subjectively perceived the environment as abusive, her participation in sexually related conduct does not defeat her claim. For similar reasons, the company's allegations that financial problems and problems with one of her sons may have contributed to Hanley's distress go to the weight of her claim, not to its existence.

The company also argues that Hanley's distress stemmed primarily from her relationship with Creacy's wife and the impact of the email discovery, both of which (we agree) do not bear on the

hostile-work-environment claim. In one respect, the company is right: The record shows that these incidents had the greatest impact on Hanley, as the discovery of the emails in particular apparently triggered her weight loss, sleep trouble and absence from work. But this extreme level of distress is not required to prevail on a hostile-work-environment claim: After all, "Title VII comes into play before the harassing conduct leads to a nervous breakdown." *Harris*, 510 U.S. at 22. Hanley's other allegations, and their alleged affect on her, sufficed to show that she subjectively perceived the work environment as hostile. While the company may ultimately convince the jury that even these effects were primarily caused by Hanley's relationship with Creacy's wife, it cannot do so as a matter of law on this record.

The company next contends that Creacy's sexually laced stories should not enter into the equation because Scott, not Hanley, testified to them, and Hanley answered "no" when asked at her deposition, "Other than the claims of sexual harassment that we've talked about, are you asserting any additional claims of discrimination that would not be of a sexual harassment variety, treated differently because you're a woman?" JA 205–06. The response, however, indicates only that Hanley agrees there are no other claims *not of a sexual harassment variety*, not that there are no additional incidents of sexual harassment that she may have forgotten. Given Scott's testimony that Hanley was present when Creacy told his stories and given Hanley's reaction that the stories were inappropriate, we see no reason at this point to discount the stories nor any reason why we should hold Hanley's inability to recount additional specific instances of Creacy's misbehavior against her. *See Abeita v. Transamerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998) (reversing summary

judgment for defendant on hostile environment claim because "[p]laintiff's inability to recount any

more specific instances goes to the weight of her testimony, a matter for the finder of facts").

B.

Hanley next challenges the district court's rejection as a matter of law of her claim for the intentional infliction of emotional distress. Under Kentucky law, this tort involves conduct (1) that is "intentional or reckless," (2) that is so "outrageous and intolerable" that it offends "generally accepted standards of decency and morality" and (3) that causes severe emotional distress in the victim. *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 2–3 (Ky. 1990).

At stake is the second element of the test. In *Akers v. Alvey*, the Sixth Circuit reversed the decision of the district court granting summary judgment to the defendant on a Kentucky outrageous conduct claim. 338 F.3d 491 (6th Cir. 2003). There, plaintiff alleged that the defendant had "engaged in pervasive, sexually offensive behavior, including the making of lewd gestures with his tongue and hand while moaning, commenting daily about [her] physique (such as 'nice ass'), getting very close to [her] and attempting to look down her blouse, questioning [her] extensively about masturbation and her sex-life with her boyfriend, expressing in front of other employees that he would like to have sexual intercourse with [her], commenting to [her] about her coworkers' sexual histories and physiques, commandeering [her] computer to send sexually explicit e-mail messages, and describing his last episode of oral sex in great detail. [She] alleged that [he] engaged in over 30 acts of inappropriate behavior in a two-and-a-half month period." *Id.* at 494. In *Wathen v. General Electric Co.*, 115 F.3d 400 (6th Cir. 1997), on the other hand, the Sixth Circuit affirmed summary

judgment for the employer in a setting where the company's upper-level management had subjected plaintiff to "sexual jokes, comments, and innuendos." *Id.* at 402. The court held that this conduct, "while crude and wholly inappropriate, does not rise to the level of the 'atrocious and utterly intolerable' as a matter of law." *Id.* at 407. Here, while Creacy's conduct does not rise to the level of the conduct in *Akers*, it is certainly more severe than the "jokes, comments, and innuendos" alleged in *Wathen*.

The holdings of other cases help to clarify the admittedly imprecise line between actionable and nonactionable conduct in this area. *Compare Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000) (reversing summary judgment for defendant where "former priest used his relationship with the husband and wife to obtain a sexual affair with the wife"); *Wilson v. Lowe's Home Center*, 75 S.W.3d 229, 238 (Ky. Ct. App. 2001) (reversing summary judgment where employee "was subjected to racial remarks on nearly a daily basis by his coworkers and supervisors for a period of approximately seven years"); *and Brewer v. Hillard*, 15 S.W.3d 1, 6–7 (Ky. Ct. App. 1999) (conduct outrageous when employee was "subjected to frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for homosexual sex"), *with Arlinghaus v. Gallenstein*, 115 S.W.3d 351, 352 (Ky. Ct. App. 2003) (affirming summary judgment for defendant, a priest, who impregnated the wife of one of his parishioners); *Allen v. Clemons*, 920 S.W.2d 884, 885 (Ky. Ct. App. 1996) (behavior not sufficiently outrageous when defendant "erected a sign . . . which stated, 'Danger—Child Molester in the Community'"). The pervasiveness and severity of Creacy's conduct suffices in this instance to establish a triable issue of fact on the question.

Creacy contends that the Kentucky Civil Rights Act occupies the field of work-related emotional distress claims and thus preempts any tort claim against him seeking similar damages. The Act, however, only "subsumes" outrageous-behavior claims against employers, not individuals. *See Wilson*, 75 S.W.3d at 239 (holding that KCRA preempts outrage claim against employer, but not individuals; "the fact that a civil rights claim may be filed against an employer does not prohibit the filing of an [outrage] claim against the offending individuals against whom no civil rights claim could have been filed"). Because Hanley filed her outrageous-conduct claim against Creacy, not the company, the Act does not preempt it.

### III.

For these reasons, we reverse and remand the case to the district court for further proceedings consistent with this opinion.