NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0131n.06

Case No. 21-3423

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td></td><td>)</td><td rowspan="13"></td></tr>
<tr><td>OLIVIA SINGLETON,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellant,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>PSA AIRLINES, INC.; BILLI MAYFIELD</td><td>)</td></tr>
<tr><td>aka William N. Mayfield, Jr.,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendants-Appellees.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

**FILED**
Mar 24, 2022
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

---

Before: SILER, KETHLEDGE, and READLER, Circuit Judges.

SILER, Circuit Judge. Olivia Singleton sued her former employer, PSA Airlines, Inc., under Title VII of the Civil Rights Act of 1964 and under Ohio's antidiscrimination statute, Ohio Revised Code Chapter 4112. She also brought state-law discrimination claims against former PSA employee Billi Mayfield. The district court granted PSA's motion for summary judgment. It prejudicially dismissed Singleton's claims against PSA and declined to exercise supplemental jurisdiction over her claims against Mayfield. We affirm.

I.

PSA Airlines hired Singleton in 2018 to work as a flight attendant trainee. She began as a probationary, at-will employee. To become a full flight attendant—and to avoid termination—she had to complete PSA's four-week training program.

Singleton began the training program on February 18, 2018. And just four days in, she had an in-class disagreement with an instructor, Billi Mayfield. After some back and forth in front of the class, Mayfield escorted Singleton to the office of Inflight Training Supervisor Jennifer Cameron. There the two exchanged complaints. Mayfield complained about Singleton's attitude and classroom demeanor, and Singleton complained about Mayfield's uninvitedly "patting" Singleton's hair on February 21.

Singleton never mentioned racial harassment or racial discrimination in her first meeting with Cameron. But she pulled Cameron aside later that day, and, without Mayfield present, she lodged two additional complaints. First, she added an extra detail to the February 21 hair-touching incident. Mayfield hadn't just touched her hair, he also commented on its texture: He said her hair was unusually soft because black people typically "only wear weaves and glue." Singleton also told Cameron that on one occasion she wore an afro hairstyle to class, and Mayfield asked if she'd "just rolled out of bed." Cameron relayed these complaints to Andrea Roush, PSA's Manager of Inflight Training.

In the days following Singleton's two conversations with Cameron, Mayfield reported several issues about Singleton's behavior. In an email to Cameron and Roush on February 27, Mayfield accused Singleton of rolling her eyes in class. And on February 28, he reported "recurring issues with [Singleton's] attitude."

On March 1, 2018, four other people complained about Singleton's behavior. Jennifer Cameron saw Singleton behave inappropriately during an evacuation drill, Instructor Lisa Wulff accused Singleton of disrupting her class, Instructor Morgan Fussinger complained about Singleton's "unprofessional and unpleasant" attitude, and a student complained about Singleton "constantly making negative comments under her breath." Roush reviewed the complaints and

then sent a recommendation to Debra Hoke, PSA's Director of Inflight Services, to release Singleton from the training program and terminate her employment. Hoke conferred with HR, accepted Roush's recommendation, and fired Singleton, effective March 3, 2018.

Just as multiple instructors complained about Singleton's behavior, multiple students complained about Mayfield's conduct. On March 1, a Jewish student accused Mayfield of performing a *Sieg Heil* salute in class. Another student accused Mayfield of telling anti-Catholic jokes and commenting on "white trash people." And, on March 8, an African-American student (Philip Duclas) accused Mayfield of making a racist comment. Mayfield allegedly told Duclas he was "so black" that all Mayfield could see were "his eyes and his teeth." PSA investigated these complaints and fired Mayfield on March 9, 2018.

On May 30, 2019, Singleton sued PSA and Mayfield in federal court. She accused PSA of fostering a racially hostile work environment, of racial disparate treatment, of national-origin discrimination, and of unlawful retaliation, all in violation of Title VII and Ohio Revised Code Chapter 4112. She also brought a series of state-law claims against Mayfield. The district court granted PSA's motion for summary judgment and then declined to exercise supplemental jurisdiction over the state-law claims against Mayfield.

On appeal, Singleton challenges the district court's dismissal of her hostile-work-environment, disparate-treatment, and retaliation claims. She has not challenged the dismissal of her national-origin-discrimination claims.

## II.

We review an order granting summary judgment de novo. *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020).

First to the hostile-work-environment claims.[1]  For a race-based hostile-work-environment claim to survive summary judgment, the plaintiff must show (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment affected a term, condition, or privilege of her employment, and (5) the employer knew or should have known about the harassment but failed to take corrective action.  *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020).

Singleton fails to satisfy the fourth element.  It requires us to consider the totality of the circumstances—including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with the plaintiff's work performance—to determine whether the racial harassment was "sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (quotation marks and citation omitted). Element four imposes a hefty burden on plaintiffs, and rightly so.  "[T]o hold otherwise would risk changing Title VII into a code of workplace civility."  *Id.* (quotation marks and citation omitted).

No reasonable juror could find Singleton suffered racial harassment severe or pervasive enough to alter the terms, conditions, or privileges of employment.  As an initial matter, we only consider harassment directed at African Americans.  *See Williams*, 643 F.3d at 511 ("[O]nly harassment *based on the plaintiff's race* may be considered.").  So placing aside Mayfield's comments or gestures about "white trash," Catholics, and Jewish students, we're left with four incidents that concerned Singleton's race.  On or about February 19, Singleton wore an afro hairstyle to class and Mayfield asked her if she just "rolled out of bed."  On February 21, Mayfield

---

[1]     Singleton sued PSA under both Title VII and Ohio Revised Code Chapter 4112.  This court's Title VII precedents apply "with equal force" to Chapter 4112 claims, *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 n.4 (6th Cir. 2000), so we analyze Singleton's state and federal claims simultaneously.

touched Singleton's hair and called it unusually soft because "black people only wear weaves and glue." On another occasion Mayfield said he's "not racist because he has black members in his family." Finally, Mayfield said one of Singleton's classmates was "so black" that "the only thing he could see was [the classmate's] eyes and teeth.[2]"

None of these incidents was physically threatening or humiliating. And none of them, individually or collectively, amounts to severe racial harassment. We regularly reject hostile-work-environment claims involving conduct considerably more egregious. *See, e.g.*, *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 513 (6th Cir. 2011) (no hostile work environment where supervisors called Jesse Jackson and Al Sharpton "monkeys" and said black people should "go back to where they came from").

Singleton's racial-disparate-treatment claims also fail as a matter of law. Evidence of racial discrimination comes in two forms: direct and indirect. When (like here) a disparate-treatment claim relies exclusively on indirect evidence, we apply the *McDonnell Douglas* burden-shifting framework. *Clay v. United Parcel Serv.*, 501 F.3d 695, 703 (6th Cir. 2007). The initial burden lies with the plaintiff to establish a prima facie case. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). A plaintiff shoulders her burden by showing (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position at issue, and (4) she was treated differently than similarly situated employees who aren't members of her protected class. *Chattam v. Toho Tenax Am.*, 686 F.3d 339, 347 (6th Cir. 2012) (citation omitted). If the plaintiff establishes each element, the burden shifts to the employer "to

---

[2]    Singleton "assumes" she overheard this comment. Viewing the evidence in her favor, we accept her assumption and consider the comment. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999) (when evaluating a hostile-work-environment claim, courts may consider instances of racial harassment directed at all members of the plaintiff's protected class so long as the plaintiff was aware of the harassing conduct).

articulate some legitimate, nondiscriminatory reason" for the plaintiff's adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. Then "the burden shifts back to the plaintiff to show pretext—i.e. that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Com.*, 580 F.3d 394, 400 (6th Cir. 2009).

Singleton has failed to identify a similarly situated non-African-American employee whom PSA treated more favorably. To be similarly situated for purposes of Title VII, employees must be "similarly situated in all relevant respects." *Tennial v. United Parcel Serv.*, 840 F.3d 292, 304 (6th Cir. 2016).

Singleton proffers two comparators, neither of whom fits these criteria. She first claims to be similarly situated to "other students" who disrespected Mayfield and came to class unprepared. But because she identified neither the names nor the races of these other students, we cannot determine whether they were outside of her protected class. She also claims to be similarly situated to Mayfield, but Mayfield is an unsuitable comparator because he held a different position and engaged in different conduct. Besides, PSA investigated the myriad complaints against Mayfield and promptly terminated him, just as it promptly terminated Singleton.

Singleton's retaliation claims fare no better. Title VII's antiretaliation provision forbids an employer from "discriminating against" an employee because the employee "has opposed" unlawful employment practices or "has made a charge, testified, assisted, or participated in" a Title VII hearing, proceeding, or investigation. 42 U.S.C. § 2000e-3(a).

Singleton believes PSA terminated her because she opposed racial discrimination. She proceeds under a cat's paw theory of liability. *See Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 420 (6th Cir. 2021). In other words, she believes biased non-decisionmakers (Mayfield and Roush) caused an unbiased decisionmaker (Hoke) to fire her.

Singleton's claims fail step one of the *McDonnell Douglas* framework.[3] To establish a prima facie case of retaliation, Singleton must show (1) she engaged in conduct protected by Title VII, (2) PSA had knowledge of her protected activity, (3) "thereafter, [PSA] took an employment action adverse to [her]," and (4) "there was a causal connection between the protected activity and the adverse employment action." *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Once again, the problem is element four. Singleton hasn't shown a causal connection between her protected activity and her termination. She relies primarily on the fact that PSA fired her eight days after she raised her racial discrimination concerns with Cameron. Temporal proximity, however, is generally insufficient to establish a prima facie case; successful plaintiffs typically pair temporal proximity "with other indicia of retaliatory conduct." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) (citation omitted). And Singleton's other indicia falls short.

She first points to Mayfield's behavior after February 22. Singleton believes she received "closer disciplinary scrutiny" after her complaint, and closer disciplinary scrutiny suggests a causal link between her protected activity and Hoke's decision to terminate her. But no evidence suggests Mayfield—or, for that matter, any of the other instructors who reported issues with Singleton— knew that Singleton had raised racial discrimination concerns with Cameron.

---

[3] Singleton claims to have direct evidence of retaliation. She offers the following examples: at some point Mayfield said "he could make or break" his students because he was "friends with people in HR," Roush "rolled her eyes" when she heard Singleton's Mayfield-related complaints, Roush asked why students complaining about Mayfield "have to take offense to everything," and Roush responded to "some students" complaining about Mayfield by saying she "was tired of the bullshit." None of this amounts to direct evidence. *Imwalle v. Reliance Med. Prod. Inc.*, 515 F.3d 531, 543–44 (6th Cir. 2008) ("Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action.").

Next, she claims Roush "rolled her eyes" and responded dismissively when Cameron told her about Singleton's race-related complaints. But the record shows that Roush reacted as such not when confronted with Singleton's complaints, but when made aware of "complaints about" Mayfield lodged by others. And even accepting Singleton's assertion, several inferential leaps separate Roush's eye rolling and dismissiveness from the pertinent conclusion: that Singleton's second conversation with Cameron on February 22 was causally connected to Debra Hoke's decision to release her from PSA's training program. The connection between Roush's eye rolling on February 22 and the recommendation she sent to Hoke in early March is too tenuous to support a prima facie case.

**AFFIRMED.**